SAVOY, Judge.
This case is consolidated with suit No. 4112 on the docket of this Court, entitled “George Ratcliff v. Milchem, Inc., et al”, La.App., 281 So.2d 778 and separate decrees will be rendered.
These cases arise out of the same accident which occurred in the Bancker Oil Field in Vermilion Parish, Louisiana, on August 21, 1969.
In the instant case, plaintiff sued Mil-chem, Inc. for injuries alleged to have been received because of the negligence of Milchem’s employee, Robert Todd. At the time of the accident, Benefield was performing services as a pumper for the operator of the field, George P. Mitchell and Associates, Inc. After exceptions of vagueness and no cause of action were overruled, Milchem filed an answer denying the negligence of Todd, and, in the alternative, pleaded contributory negligence and assumption of risk on the part of Benefield. Milchem further incorporated in its alternative plea, a third party petition for contribution against D & A Construction Company, Inc. and its liability insurance carrier, Hartford Accident and Indemnity Company.
Milchem later supplemented its answer and third party petition and named as additional defendants the following officers of Mitchell, the operator of the field: George P. Mitchell, Bernard F. Clark, John D. Martin, Morris D. Thompson, Jr., E. A. Riley and Sidney Walker. These officers will be referred to hereinafter in this opinion as “Mitchell officers”. Also, in the supplement to Milchem’s answer, the St. Paul Fire and Marine Insurance Company, the liability carrier of Mitchell, was made defendant. St. Paul, as the workmen’s compensation insurer of Mitchell, intervened to seek workmen’s compensation benefits and medical expenses paid to and on behalf of Benefield.
A crew from D & A, including George Ratcliff, plaintiff in suit No. 4112, was doing repair work in the field at the time of the accident, and the third party petition of Milchem was predicated on the alleged negligence of the crew.
In suit no. 4112, Ratcliff, plaintiff therein, filed his petition against Benefield, the Mitchell officers, and St. Paul, as liability insurer. In the alternative, and in the event it should be found that none of these defendants were negligent, Ratcliff prayed for judgment against Milchem and its liability insurer, Aetna Casualty and Surety Company. Hartford, as workmen’s compensation insurer for D & A, intervened to recover workmen’s compensation benefits and medical expenses paid to and on behalf of Ratcliff. In their answer, Milchem and Aetna denied that any act of Todd contributed to the accident, and pleaded in the alternative, the contributory negligence and assumption of risk of Ratcliff, and, further in the alternative, they sought contribution from Benefield, the Mitchell officers, St. Paul, D & A, and Hartford, by way of a third party demand.
The cases were tried before a jury, the trial consuming seven full trial days. On November 19, 1971, at 7:40 P.M., the jury returned to the courtroom with the following verdict:
“JURY VERDICT
“1. Was Milchem guilty of negligence which was a proximate cause of the accident. Yes
“2. Was C. D. Benefield guilty of negligence which was a proximate cause of the accident. No
*773 “3. Was George Ratcliff guilty of contributory negligence. No
“4. Was D & A Construction, Inc. guilty of negligence which was a proximate cause of the accident. No
“5. Were any of the following guilty of negligence which was a proximate cause of the accident:
“1. Sidney D. Walker, Jr. No
“2. E. A. Riley ~No
“3. Bernard F. Clark No
“4. John D. Morton No
“5. George Mitchell No
“6. Morris D. Thompson No
“6. Was C. D. Benefield insured under the policy of St. Paul Fire and Marine Insurance Company. Yes
“Answer the next question if you have answered ‘Yes’ to No. 1 and ‘No’ to No.
2.
“7. What amount of money would compensate C. D. Benefield for his damages. $75,000.00
“Answer the next question if you have answered ‘Yes’ to any of the following: No. 1, No. 2, or any part of No. 5, and if you have answered ‘No’ to No. 3.
“8. What amount of money would compensate George Ratcliff for his damages. $65,000,00
“s/ Alvin J. Picard
“Foreman”
The jury found that Milchem was the only party guilty of negligence which was the proximate cause of the accident. Judgment was rendered in favor of Benefield and against Milchem for $75,000.00, subject to the rights of St. Paul as workmen’s compensation carrier and intervenor; and in favor of Ratcliff against Milchem and Aetna for $65,000.00, subject to the rights of Hartford as workmen’s compensation carrier and intervenor; ánd the third party petitions of Milchem and Aetna were dismissed. Milchem and Aetna appealed sus-pensively, and devolutive appeals were applied for by Benefield, Ratcliff and Hartford, and also by St. Paul because of the jury verdict that it afforded liability coverage to Benefield.
The record reveals that in the locale where the accident occurred, there were two “heater-treaters”. The function of a heater-treater, an upright tank, in an oil field is to take the emulsion as it comes out of an oil well, and by the use of heat (and sometimes chemicals) within, the heater-treater, the emulsion is broken down into water, oil, and natural gas. The emulsion enters the heater-treater at the emulsion inlet close to the top of the heater-treater, and falls to a plate in the top part of the heater-treater, after which it goes down through a pipe that takes the emulsion to the bottom of the tank where it is spread out on a spreader plate. The emulsion then rises past a fire tube (inside of which is a burner), and it continues to rise through a series of baffles with the oil rising to the top and going out of the tank at the oil outlet, down through a valve (sometimes called a “dump valve”), and then to the oil storage tanks.
The water, which is released in the process, goes out through a pipe inside the heater-treater near the bottom, and travels up through a pipe which is within another pipe known as the outside siphon (sometimes referred to as a “water leg”). When the water gets near the top of the inside pipe where it meets the gas, it spills over and down and fills the outside siphon around the inside water pipe and goes out through a diatroller valve (dump valve) and to the water tanks through the water line.
The gas accumulates at the top of the heater-treater tank and fills the top compartment. This gas, which is under pressure, meets and is not in any way separated from the water within the outside siphon or water leg. Part of the gas goes through the gas outlet and pipes off to another area, with a portion of the gas going *774 through a line to what is known as a scrubber, whose function is to remove the moisture from the gas, and then the gas goes into the fire box and is used as fuel for the burner in the heater-treater.
The heater-treater involved in the accident, which will be called the “Benefield heater-treater”, received emulsion from Wells 4 and SD. The emulsion was treated, and the oil was pumped to oil tanks, which were completely separate from the operation of the other heater-treater. However, the water from the Benefield heater-treater went out through a water line and into water tanks 1835 and 1836. The other heater-treater, which will be designated as the “Todd heater-treater”, received emulsion from Wells 1, 4D, 5D and 2, which went through a separator first, and then the oil went through the oil outlet into oil tanks 1833 and 1834. The water line from the Todd heater-treater joined the water line from the Benefield heater-treater, and then the common line carried the water to water tanks 1835 and 1836. There was a valve immediately preceding the inlet into each of these two water tanks that would stop the flow of water into the respective tanks. It should be noted at this time that the wells involved herein are what is termed “marginal wells”. By marginal wells is meant that the proportion of oil to water, or the percentage of oil in the untreated emulsion as it comes out of the well is roughly about 5%, which just barely makes it profitable to handle. In other words, there is approximately 20 times more water than there is oil in the emulsion as it goes into the heater-treaters for separation into oil, gas and water.
The water dump valve on each of the heater-treaters was designed to hold a certain water level in the water leg of the heater-treater. As the water level rises, the weight of the column of water will increase, which raises the handle of the dump valve. The dump valve is rigged so that weights can be attached in varying amounts as indicated by the flow. These weights are normally attached to the valve by the pusher. The valve is designed to allow a periodic flow as the water reaches a certain level. The important thing to note here is that although the Benefield heater-treater and the Todd heater-treater had separate oil tanks connected to an outlet in each heater-treater respectively, there was a common pair of water tanks to hold the water that would come out of the Benefield heater-treater water dump valve and the Todd heater-treater water dump valve into the common water line.
The record also reveals that Todd, as the employee of Milchem, had contacted Bene-field some time before the accident in question with reference to having Bene-field, as pumper and in charge of the batteries including heater-treaters concerned here, to use chemicals marketed by the defendant, Milchem. These chemicals, which were used in the Todd heater-treater (and not in the Benefield heater-treater) when correctly added to the emulsion coming from the well, were supposed to aid the performance of the heater-treater in its breaking up of the emulsion into oil, gas and water. On August 20, 1969, the day before the accident, while Todd was checking the Todd heater-treater relative to the effect of the chemicals, he observed that the water level appeared low to him. Todd felt in his own mind that the water level was too low, and should be built up. However, without checking with Benefield, the pumper in charge, or anyone else, Todd decided he would shut off the water discharge from the heater-treater, which he thought would build up the water level to what he thought was a safe level. Todd looked for a valve close to the heater-trea-ter that he could manipulate to stop the flow of water out of the heater-treater. He found none and proceeded to walk along the water discharge line in an attempt to find a valve that would stop the water flow. At one point, he came to a “T” junction. He attempted to walk out one of the lines leading to the T, and it became lost in the brush. He assumed that it went to discharge water in a salt water *775 pool. Todd then went back and retraced the other pipe starting at the junction and found that the water pipe went up to the water tanks heretofore described as Water Tank No. 1835 and Water Tank No. 1836 (which, as has already been noted, received water also from the Benefield heater-treat-er). Todd observed that the water line led into two discharge lines, one for each water tank, with a cut-off valve on each. Thereupon Todd closed both of these valves, which prevented any water from going into the aforesaid water tanks, with the result that the water discharge line from the Benefield heater-treater was blocked.
Benefield’s duties did not require him to be in the field at the time this was taking place, and he was in Abbeville, some distance away from the field. When Benefield was not in the field, he could usually be found by checking at a cafe in Abbeville that he owned. Todd had no authority or permission to regulate the heater-treater by any means, much less by closing valves. The subject was never even mentioned between Todd and Benefield up to that time. In any event, after some considerable time, Todd decided he would go into Abbeville to Benefield’s cafe, which was a number of miles away.
It was late in the afternoon when Todd arrived at Benefield’s cafe. Benefield, in his testimony, stated that around 2:30 in the afternoon Todd came to his place of business and told him that he had closed the valves on top of the water tanks about three hours before. Todd then asked Benefield if that would hurt anything. Benefield told Todd that that would “mess up everything” out there because when Todd closed the valves, it put additional pressure on the line, especially in view of the fact that the Benefield heater-treater was not able to discharge its water either. Upon arriving at the field Benefield ascertained that water had actually backed up, however, the Todd heater-treater appeared to be working all right, so he then went to what he termed the “No. 2” heater-treater, referred to in this opinion as the Benefield heater-treater. When he got close to the heater-treater, he was some water spurting from a hole in the water discharge pipe leading from the Benefield heater-treater. At this time Benefield remarked to Todd that due to the fact that he had blocked the water discharge from the Benefield heater-treater, he had caused back pressure on that line. He felt this additional pressure had something to do with the hole appearing in the line, at a spot approximately four feet from the heater-treater. He ■put a small peg in the hole and plugged it up, with the intention of contacting D & A and having it send out a crew of men to replace the section of pipe the following morning.
When the D & A crew arrived the next morning, they prepared to replace the joint of pipe, or the nipple as they termed it, and Benefield, to assist them in carrying out the project, held the water dump valve closed (he thought there was water in the line based on the observation that water came from that leak the previous day) by pulling down on it himself. He testified, and the evidence corroborates this, that he could manually keep the water from discharging for about ten minutes or more while the work was being done on the water discharge pipe, and this would cause no ill effects insofar as the particular heater-treater was concerned. He did testify that the temperature was only 90 degrees at the heater-treater, which showed that the burner was not burning, and therefore the heater-treater was not working. He felt that because of the water backing up the heater-treater had malfunctioned. In any event, the crew from D & A started dismounting the pipe, and after the joint had been broken, a small amount of water and oil came out, but a great deal of natural gas came out. The natural gas was ignited evidently from a spark created by the crew from D & A. Benefield and Ratcliff were immediately enveloped with flames, which apparently originated near the feet of Benefield who was standing right adjacent *776 to the heater-treater. The fire and pain caused Benefield to release his hold on the water dump valve, and more gas came out, adding fuel to the flames. Benefield and Ratcliff, being practically adjacent to the area of the leak, received the most severe burns.
There can be no doubt as to the existence of negligence and imprudence on the part of Todd. The record is abundantly clear that he had no business or responsibility whatsoever relative to adjusting the water levels in either of the heater-treat-ers. When examining the heater-treater and noting that there was no cut-off valve from the water leg by the heater, which he should not have touched anyway, he compounded the negligence by walking off the line and turning off the two valves to the water storage tanks without ascertaining that it was safe to do so. He had no knowledge whatsoever as to what effect the closing of these valves might have on other parts of the field. That was the province of Benefield as pumper and the man in charge.
As to the presence of gas in the water pipe and the water leg (or water siphon), it appears that the evidence as a whole supports the findings that there was gas present in the water line and in the water leg. There are different theories as to how the gas came to be present, but present it was. There is no question but that there was a violent explosion of some kind. Appellant contends that when Bene-field “bled” some solution from the Bene-field heater-treater by means of a valve near the bottom, this substance from the heater-treater could be the thing that caught fire. It must be remembered that this substance was approximately 5% oil and the balance was water, and the evidence supports the conclusion that this would not be the type of substance that would become highly inflammable, if at all. The evidence clearly indicates that after the explosion there was no obvious area of fire and explosion that one would ordinarily find in the event that an inflammable liquid had ignited and burned on the ground.
The chief thrust of the appellant’s brief appears to be its contention that the negligence of Todd was not a proximate cause of the accident. Appellant argues that the explosion and severe burns occasioned by Benefield and Ratcliff as a result thereof were too remote in time and space to Todd’s actions of the preceding day. Plaintif f-appellee states in his brief:
“The negligent act of Todd in shutting the two water valves on August 20 caused gas to be in the water line on the Benefield heater-treater. The gas was there.as the natural and probable consequence of Todd’s negligence. Certainly not Benefield or anyone else caused the gas to be there. There certainly is no evidence to substantiate a contrary contention.”
We agree with the law applicable to this case as stated by plaintiff, quoting from the case of Chavers v. A. R. Blossman, Inc., 45 So.2d 398 (La.App. 1 Cir. 1950):
“We think it is well established that the general doctrine of foreseeability is not applicable to the extent of relieving one who sets in motion, through the agency of the negligent act, a chain of circumstances leading to the final resultant injury.”
The jury found that the accident was due to the negligence of Todd, Milchem’s employee. There is certainly ample evidence in this record to justify the jury’s reaching such a conclusion.
Counsel for appellant contends the jury was led astray by the instruction that “negligent conduct is a cause in fact of harm to another if it was a substantial factor in bringing about such harm”.
The trial judge, in his charge to the jury relative to negligence, quoted verbatim Articles 2315 and 2316 of the Louisiana Civil Code. The charge, construed as a whole, *777 adequately and fairly informs the jury reí-ative to negligence, proximate cause, and the other relevant principles of law concerned in this matter.
The jury awarded $75,000.00 to Benefield. This was to cover all damages, including the medical expenses of $12,712.-96. Benefield was earning $500.00 per month when he was injured.
Photographs of Benefield taken in January of 1970 were introduced into evidence. It is obvious from an examination of these photographs that Benefield suffered extensive burns, and has a significant amount of residual permanent scarring. The films show extensive scarring on both arms, and very severe scarring on the underside of the arms. Also, there is very evident scarring on the right side of the lower back, on the back of the right leg, and other parts. Also, scarring is evident as a result of removing skin from the legs for skin grafting.
Benefield suffered severe second and third degree burns over almost his entire body, including the face, head, neck, arm, legs and trunk. He was attended immediately after the accident by Dr. Ardley Hebert of Abbeville, Louisiana, who testified that when he arrived at the hospital, Bene-field was in shock, and they had to cut down into his ankles in order to inject plasma and other materials into Benefield’s body. Dr. Hebert said that this was the only place they could inject and infuse Benefield because the arm and other parts that normally could be used were so badly burned that “skin was just hanging on his arms”. His legs were also severely burned. Benefield’s first admission to the hospital lasted for 56 days, or until October 16, 1969. During that period of time, he suffered severe and excruciating pain and anguish. He was in critical condition during the early period of his hospitalization, and it was “touch and go” as to whether his body could survive the shock. Numerous skin grafts had to be performed in the initial hospital period, and in January of 1970, he had to be readmitted and operated upon for surgical correction of a scar contraction. At that time Dr. Hebert did what is called a “Z-Plasty”, which lessened the constriction due to severe scarring under the arm.
Dr. Hebert testified that the scars depicted on Benefield’s photograph exhibit no. 4 would be permanent. As to Bene-field’s ability to work, Dr. Hebert stated that he could not return to his work as a pumper in the oil fileds, which was what he was doing at the time of the accident and earning $500.00 per month.
Benefield was also seen by Dr. Lester Larson of Galveston, Texas, who examined him at the request of defendant. Dr. Larson’s testimony verified the fact that the burns were very severe, and the scars remaining at the time of his examination were permanent. He did testify as to the severe scarring already noted on the pictures hereinabove discussed. This doctor felt that one of Benefield’s primary problems was that of cosmesis, or his appearance. Dr. Larson said it would be obvious to anyone that this man had a severe burn because of the noticeable scarring. This doctor also stated that further surgery could not benefit Benefield due to the fact that the scarring and discoloration were so extensive. Dr. Larson thought that Bene-field might be able to do some of the work that he had been doing at the time of the accident. However, Dr. Larson was careful to point out that Benefield would have to wear a large brim hat and long sleeved shirts and gloves and long trousers if he were exposed to the sun for any significant time. Further, he felt there was a possibility of Benefield’s skin being irritated by chemicals and noxious fumes.
Ratcliff, plaintiff in suit no. 4112, was awarded $65,000.00, out of which had to be paid $14,825.96 to Hartford for medical expenses and workmen’s compensation already paid on behalf of Ratcliff’s employer. Ratcliff also sustained very serious burns, with resultant scarring. Imme *778 diately after the accident, he was also treated by Dr. Ardley Hebert, who stated that Ratcliff had burns over 65% of his body. This doctor stated he could not even give anesthesia to ease Ratcliff’s pain for a considerable time because the vital signs were so low that Ratcliff quite possibly could have died. There is no question but that this man suffered severe and excruciating pain and agony for a long period of time. In addition to this, he also had a reaction to certain medicine which required that he be physically restrained because the pain and itching caused him to tear at his bandages for a period of several days. Dr. Hebert verified the existence of the allergy; as a matter of fact, one of the nurses said that for a period of five days and five nights, she got hardly any sleep because it took her and another nurse almost continuously to hold Ratcliff to keep him from scratching his bandages off. Ratcliff said that, “I never thought a person could hurt as bad as I hurt and still live.” He was in the hospital 38 days.
The testimony of all doctors concerned, including the testimony of Dr. Frank H. Davis, Jr., a dermatologist from Lafayette, Louisiana, verified the existence of severe damage to Ratcliff’s sweat glands. This would cause complications because he would be unable to cool himself when it was hot, or adapt to cold weather in the manner he would have had he not been burned. Dr. Hebert said he did not think plaintiff could carry out the duties of an oil field roustabout. Ratcliff was earning $110.00 a week as a roustabout, and at the time of the accident was 48 years of age. The testimony does indicate that plaintiff had been a roustabout for only about five months, and there was probably some other work he had done in the past that he could still perform. As a matter of fact, however, he would both physically and mentally carry the scars of this experience with him all of his life.
We are of the opinion that the jury did not abuse the discretion allowed it under Article 1934 of the Civil Code of Louisiana.
For the reasons assigned, the judgment of the district court should be affirmed at appellant’s costs.
Affirmed.