333 So.2d 395 (1976)
Villere REGGIO et al.
v.
LOUISIANA GAS SERVICE COMPANY et al.
No. 7381.
Court of Appeal of Louisiana, Fourth Circuit.
May 18, 1976.
Rehearing Denied June 9, 1976.
*398 Gauthier & Murphy, Wendell H. Gauthier, Robert M. Murphy, and Porteous, Toledano, Hainkel & Johnson, Geoffrey H. Longenecker, New Orleans, for plaintiffs-appellees.
Phelps, Dunbar, Marks, Claverie & Sims, Harry S. Redmon, Jr., Harry A. Rosenberg, New Orleans (counsel on appeal only), and Jesse R. Adams, Jr., New Orleans, of counsel, and Reynolds, Nelson & Theriot, John C. Reynolds, New Orleans, for defendants-appellants.
Before GULOTTA, SCHOTT and St. AMANT, JJ.
GULOTTA, Judge.
Defendants appeal from a jury award totalling, in the aggregate, the sum of $905,000.00 for injuries sustained by a 67-year old father, 62-year old mother, a 22-year old son and a 17-year old son, resulting from a gas explosion in their home on October 26, 1974.[1] Plaintiffs have not answered the appeal. We amend and affirm.
*399 It is defendants' contention, on appeal: 1) that the trial judge erred in denying defendants' motion for continuance; 2) that the questioning of prospective jurors in the voir dire and the opening and closing arguments by plaintiffs' counsel improperly appealed to the prejudice and emotions of the jurors; 3) that the trial judge erroneously permitted the introduction of video tapes showing physical therapy treatment administered to Villere Reggio; 4) that plaintiffs failed to show by a preponderance of the evidence that the explosion resulted from defendants' negligence; and, 5) that the amounts of the jury awards are excessive.
With respect to the denial of the motion for continuance, defendants complain that they were not permitted sufficient time to prepare their defense. According to defendants, the accident occurred on October 26, 1974, and the trial took place on April 17, 1975. Defendants claim that only three months were allowed for preparation for trial between the date the suit was filed, January 17, 1975, and the trial date, April 17, 1975. They also point out that from the date notice of trial was received, March 6, 1975, counsel had only six weeks to prepare for a jury trial which involved the testimony of 45 plaintiffs' witnesses, 9 defense witnesses, many of whom were experts, 955 documents and a transcript which numbers approximately 1,000 pages. According to defendants, they were unable, because of lack of sufficient time, to depose 15 of plaintiffs' witnesses or to properly study and analyze hospital records and medical reports.
In connection with plaintiffs' questioning on voir dire and opening and closing arguments, defendants suggest that plaintiffs' counsel was permitted to question prospective jurors on whether they had any reservations about rendering a $1,000,000.00 judgment. According to defendants, this prejudicial questioning by plaintiffs' counsel, in effect, elicited a promise from the prospective jurors to return a $1,000,000.00 verdict. Defendants claim that the $905,000.00 award supports this contention. Defendants further complain that plaintiffs' counsel, in opening and closing arguments, suggested that each juror identify with one of the plaintiffs and put himself in the place of that injured party. According to defendants, this "golden rule" argument has been condemned by courts as being prejudicial, inflammatory and designed to appeal solely to the prejudice and emotion of jurors.
Louisiana Gas Service Company, hereinafter referred to as LGS, contends the trial judge erred in permitting the presentation of a video tape to the jury, showing Villere Reggio's April 5, 1975 physical therapy treatment. According to defendants, the film presentation allowed the Reggios to present self-serving testimony, not subject to cross-examination, because LGS was not given the opportunity to be present when the video tape was made. LGS further claims that the video tape was cumulative evidence, calculated to arouse sympathy for plaintiffs.
With respect to defendants' argument that plaintiffs failed to show by a preponderance of evidence that defendants' negligence was the proximate cause of the explosion, LGS contends that plaintiffs failed to establish that gas, escaping from a fracture in the curb cock,[2] moved through "connecting voids" in the subterranean organic soil (in which the service line rested),[3] collected beneath the house slab, then migrated up the side of the Reggio home into air vents, then to the attic, where the gas exploded. According to defendants, the gas would have dissipated into the air near the vicinity of the break. Apparently *400 defendants acknowledge, by their inspection of the service line, that a fracture did occur at the curb cock, approximately 20 feet from the meter attached to the house; however, they suggest that the break resulted from the explosion, rather than caused the explosion. Inferentially, defendants suggest that the explosion could have resulted from leaks at a clothes dryer which had been connected by Michael Reggio, and not by a licensed plumber, or at the water heater, or heating system.
On quantum, defendants contend that a $702,500.00 award to Villere Reggio, a 67-year old retiree who sustained first and second degree burns over 30% of the body requiring 59 days of hospitalization followed by one month of home physical therapy, but not requiring any skin grafts, is excessive. Defendants point out that the award does not include any amounts for past loss of earnings, future loss of earnings or substantial future medical expenses. According to defendants, the total medical expenses incurred for Villere Reggio amounted to $13,186.81.
Defendants further complain that the $127,500.00 award in favor of Marie Reggio is excessive. LGS asserts that Marie sustained first and second degree burns of between 7% and 13% of the body, i. e., to the face, ear, right arm, left posterior upper arm and right leg. Defendants point out Mrs. Reggio was hospitalized for a period of 14 days followed by outpatient care, suffered no functional disability, requires no future surgical treatment or follow-up care, and suffered no emotional trauma as a result of the explosion. Called to our attention is the fact that Mrs. Reggio suffered no loss of earnings and incurred $2,039.40 in medical expenses.
According to defendants, the $57,500.00 award in favor of Michael Reggio, the 22-year old son, is also excessive. Defendants claim Michael sustained burns over 10% of the body, was hospitalized for 22 days, returned for three outpatient physical therapy treatments, was declared fit to return to work on January 9 and did, in fact, return to work on January 20, less than three months after the accident occurred. Defendants represent that by early January, Michael's scars had healed and that Michael suffered no functional disability and required no future surgery. Also called to our attention by defendants is that loss of earnings was stipulated in the sum of $2,310.00, and medical expenses incurred were $2,985.20.
Defendants finally complain of the excessiveness of the $17,500.00 to Nicholas Reggio, the 17-year old son, who received, according to defendants, a laceration of the left foot and right hand and burn of the right foot. Nicholas sustained no disability and incurred medical expenses in the sum of $138.00.

CONTINUANCE
A chronology is helpful when considering whether the trial judge erroneously denied defendants' motion for continuance. The accident occurred on October 26, 1974. Plaintiffs' suit was filed on January 17, 1975. On March 6, 1975, defense counsel received notice that the trial was set for April 17, 1975. Motion for continuance was filed on April 3, 1975. The trial commenced on April 17, 1975.
The record contains uncontradicted argument by plaintiffs' counsel that on October 29, 1974 (three days after the explosion), he spoke with counsel for LGS with respect to the gas explosion. In addition, it was stipulated that on December 13, 1974, LGS was notified by counsel for plaintiffs that the residue from the Reggio residence would be removed on December 18, 1974, unless LGS had any objections. Clearly, at the time of the stipulation, defendants had notice of the impending lawsuit. The record further indicates that two days after the explosion, LGS removed the damaged service line. Therefore, their investigation of the accident commenced two days after the occurrence.
*401 LSA-C.C.P. art. 1601 provides:
Art. 1601. Discretionary grounds
"A continuance may be granted in any case if there is good ground therefor." (underline ours)
LSA-C.C.P. art. 1602 states:
Art. 1602. Peremptory grounds
"A continuance shall be granted if at the time a case is to be tried, the party applying for the continuance shows that he has been unable, with the exercise of due diligence, to obtain evidence material to his case; or that a material witness has absented himself without the contrivance of the party applying for the continuance." (underline ours)
In denying defendants' request for a continuance, the trial judge stated:
"Well, I have give [sic] this matter a lot of thought and I know that it is probably going to be burdensome on counsel for both sides, but I don't believe that the case is going to get any better with age, and this Court is going to deny the continuance and order that this case be set for trial on Thursday morning."
As pointed out by plaintiffs, LGS had knowledge of the existence of the possibility of an impending lawsuit within three days after the explosion and had equal, if not more, opportunity for preparation than plaintiffs. Under the circumstances, we find no merit to defendants' assertion that they were unable, with the exercise of due diligence, to obtain evidence material to their case. Defendants have not shown grounds for a mandatory continuance. Nor can we conclude that the trial judge abused his discretion in refusing to grant the motion for continuance. See Bryer Insurance Agency, Inc. v. Bruno, 261 La. 177, 259 So.2d 55 (1972); Michigan Wisconsin Pipe Line Company v. Peterson, 192 So.2d 900 (La.App. 2d Cir. 1966); Williams v. Fontane, 175 So.2d 686 (La.App. 1st Cir. 1965); Allen v. Riley Mobile Home Sales, Inc., 307 So.2d 773 (La.App. 3d Cir. 1975). We find no merit to defendants' contention that error was committed by the refusal to grant a continuance.

VOIR DIRE AND ARGUMENT
LGS claims that prejudicial error was committed by plaintiffs' counsel during the voir dire examination when counsel was permitted to question prospective jurors concerning any reservation they might have about rendering a $1,000,000.00 judgment. Complaint is raised to the following specific question on voir dire:
"Now, if I prove that the damages and the injuries as alleged, would you have a hesitancy about awarding a large judgment in excess of one million dollars?"
and other questions on voir dire of the same import.
In addition, defendants complain of plaintiffs' counsel's repeated suggestion, in opening and closing arguments, that the jurors choose one of the injured family members to identify with and place themselves in the place of that injured party. According to defendants, this "golden rule" argument has been condemned by courts of other jurisdictions as being prejudicial and inflammatory.
We do not consider the propriety of questions asked on voir dire or the propriety of plaintiffs' opening and closing arguments. No objection was made to the questions or to arguments. As a matter of fact, defendants' examination on voir dire embellished on the question regarding the $1,000,000.00 figure by inquiring of the jurors whether or not they could return a verdict denying plaintiffs any amount, if the facts show no liability on the part of defendants.
In the recent Louisiana Supreme Court case of Temple v. Liberty Mutual Insurance Company, 330 So.2d 891 (La.1976),[4] our *402 Supreme Court reiterated the well settled jurisprudential rule that failure to object to alleged inflammatory statements made to the jury constitutes a waiver of the right to complain on appeal. See also Luquette v. Bouillion, 184 So.2d 766 (La.App. 3d Cir. 1966); Troxlair v. Illinois Central Railroad Company, 291 So.2d 797 (La.App. 4th Cir. 1974), writ refused, 294 So.2d 834 (La. 1974). In the absence of objection to allegedly improper questions or argument, the trial court is not afforded the opportunity to prevent or correct the alleged error. See Bertoli v. Flabiano, 116 So.2d 76 (La.App. 1st Cir. 1959).
Under the circumstances, we conclude that failure to object to the claimed improper questions on voir dire and to improper opening and closing arguments constitutes a waiver of the right to complain on appeal.

ADMISSIBILITY OF VIDEO TAPE
We find no merit in defendants' contention that the video tape showing of physical therapy treatments, administered to Villere Reggio two weeks prior to trial, allowed the Reggios to present self-serving testimony not subject to cross-examination, and was designed to arouse antipathy towards LGS and sympathy for the Reggios. Marlene Early, the attending East Jefferson Hospital physical therapist at the time of the filming, testified at trial and was subject to cross-examination by defense counsel. Villere Reggio also testified at trial and was subject to cross-examination. Further, the record discloses that prior to showing the tape to the jury, the trial court viewed the tape in chambers and deleted certain portions of the film that were irrelevant or contained grimacing facial expressions evidencing pain. In addition, the trial court stated:
"* * * The Court felt that the admission of this video tape, because of its probative value and its use in instructing the Jury in the type of treatment presently being administered to the Plaintiff, far outweighed any prejudicial affect. Let the record reflect that during the showing of this tape, there was a brief glance of a facial grimace by the Plaintiff, and this Court believe [sic] that it was so quick and instantaneous, that it had no prejudicial affect, but I am going to instruct the Jury to disregard any facial expressions of any type by the Plaintiff, Villere Reggio, during the showing of this tape."
It is well settled that the presentation of evidence through properly authenticated motion pictures is permissible and within the broad discretion of the trial court. Luquette, supra; Carvell v. Winn, 154 So.2d 788 (La.App. 3d Cir. 1963). In the instant case, we find no abuse.
We might add that from our review of the video tape, we fail to give any weight to the claim that the film prejudiced, aroused sympathy or inflamed the jury in favor of Villere. From our observation, it had the opposite effect. We reject defendants' assignment of error on the admissibility of the video tape.

NEGLIGENCE
The thrust of defendants' appeal on the question of liability is that plaintiffs failed to prove by a preponderance of the evidence that the explosion resulted from the negligence of LGS and that the jury finding is manifestly erroneous, not supported by the evidence. We disagree.
Well established in our jurisprudence is the rule that the degree of care owed others increases in relation to the increase in the inherent danger. Culpepper v. Leonard Truck Lines, 208 La. 1084, 24 So.2d 148 (1945); Pagitt Well Service, Inc. v. Sam Broussard, Inc., 293 So.2d 631 (La.App. 3d Cir. 1974), writs refused, 295 So.2d 817 (La.1974). Clear from the record and undisputed is the fact that the explosion and fire were caused from an accumulation *403 of natural gas in the Reggio residence. Natural gas, because of its highly inflammable and explosive character, is recognized in our jurisprudence as an inherently dangerous instrumentality and those who handle and distribute it are charged with the duty to exercise that degree of care commensurate with its dangerous character for the protection of the public from any foreseeable injury. Raphael Brothers v. Cerophyl Laboratories, 211 La. 354, 30 So.2d 116 (1947); Royal Insurance Company v. Fidelity and Casualty Company of New York, 256 So.2d 352 (La.App. 1st Cir. 1971); Feely v. National Packing Co., 141 La. 903, 75 So. 837 (1917); Allstate Insurance Company v. Town of Ville Platte, 269 So.2d 298 (La.App. 3d Cir. 1972), writ refused, 271 So.2d 534 (La.1973). Furthermore, a corporation dealing in a dangerous agency, such as gas, must adopt some reasonable method of safeguarding against its escape. Loyocano v. Louisiana Power & Light Co., 165 So. 515 (La.App.Orl.1936), amended, Loyocano v. Louisiana Power & Light Co., 166 So. 150 (La.App.Orl.1936).
Plaintiffs claim LGS violated the high standard of care required of a gas company in the care and maintenance of a dangerous instrumentality. It is plaintiffs' position that LGS was aware or should have been aware of soil subsidence in the area of plaintiffs' home, that soil settlement can cause stress or strain on underground gas pipelines, and that the inspection procedure and care exercised in the inspection and maintenance of the gas pipelines was lax.
Supporting plaintiffs' position is the testimony of Frank Richardson, a neighbor of the Reggios, who stated that he had lived in the Reggio neighborhood for approximately 18 years and, during that time, has made sandfills in his yard approximately every three years because of sinking and settling of the soil. James Naremore, vice president of operations for LGS, testified that the gas company had been concerned about a soil settlement problem on the east bank of Jefferson Parish (which includes plaintiffs' premises) because of the effect that subsidence was having on the underground gas lines. According to Naremore, soil settlement puts the gas lines under considerable stress and strain as the settlement of the land continues. Naremore stated that the strain could cause breaks in the system. This testimony was corroborated by that of Stephen E. Steimle, a civil engineer with expertise in soil mechanics, who testified that settling of the soil could produce pressure on anything under the surface.
Steimle's testimony was contradicted by that of Gayden Derickson, a civil engineer with expertise in soil engineering and metallurgy, who stated that ground settlement could not have caused the break in the service line. He further stated that, in his opinion, the break was a result of a sudden and unusual force.
Undisputed is the fact that in the area of plaintiffs' home, there existed an extensive soil subsidence problem and that LGS was aware of the problem and the effect of the subsidence on underground gas lines. Nevertheless, no evidence was offered by LGS to show that any additional precaution, other than the standard inspection procedures normally followed, was undertaken in the area.
In connection with the methods normally used by LGS, Joseph Maggio, the meter reader with LGS for the Reggio house, testified that on a monthly basis, he checked for gas leaks by smelling for gas or looking for dying grass or bushes in the gas meter area. His last reading before the fire was made on October 7. According to Maggio, in the event a smell of gas was detected by the meter reader or dying vegetation was observed, it was the meter reader's responsibility to call this to the attention of an LGS service man.
According to Naremore, the standard routine of safety measures employed by LGS includes a monthly patrol of the entire system by the meter readers. Naremore also testified that an annual survey of the business district area and public buildings, *404 schools and churches is made with a "flame-pack detector" designed to discover leaks; and, that neighborhood residential areas, such as the Reggios, are inspected on a five-year basis. The testimony of Naremore is not clear on the extent of the five-year inspection, other than the fact that vegetation surveys are conducted on a continuing, on-going basis.
Also, on the issue of negligence, plaintiffs produced an expert metallurgist, Dr. Courtney C. Busch, who testified that the gas pipe at the curb cock was not threaded in accordance with standards of the industry and that this deficiency could have contributed to the break in the pipe. This testimony was uncontradicted and could have been the basis for the jury's finding of negligence on the part of LGS.
The Louisiana Supreme Court in Naquin v. Marquette Casualty Company, 244 La. 569, 153 So.2d 395 (1936), confronted with a gas explosion case, held that the failure of employees of a municipal gas distribution system to discover a dime-size leak in a corroded underground service pipe constituted negligence where the municipal inspection system was inadequate. The court concluded, in Naquin, that a gas leak inspection procedure, unaided by detection instruments, was totally inadequate where a substantial portion of the inspection procedure consisted of the mere watching for leaks by the meter reader as he traversed his route each month. The Naquin court stated:
"When the municipal inspection system is viewed as a whole, as must be done, it is apparent that it lacked the intensity and effectiveness commensurate with the dangerous character of natural gas. Especially is this true as to the service lines, such as the one in the instant case, which lie close to residences and business establishments containing ignition agents. * * *"
Admittedly, the Naquin court was influenced by the fact that there existed a 29%-50% unaccounted for amount of gas, while in the instant case the testimony of the LGS officials is that there existed in the New Orleans area only a 2%-4% unaccounted for amount of gas. Nevertheless, considering the circumstances of soil subsidence in the affected area which could cause stress on service gas lines, we cannot say the jury committed error when the instant case, when viewed as a whole, and particularly the extensive degree of it concluded that LGS violated the high standard of care required of a gas company when dealing with a dangerous instrumentality.

CAUSATION
Having so concluded, we now turn to the question of causation. Although acknowledged by LGS that it is their responsibility to maintain the service line and also that their inspection subsequent to the explosion revealed a leak in the service line at the curb cock, defendants maintain that plaintiffs failed to show by a preponderance of evidence that the leak pre-existed the explosion. We do not agree.
The jury had the benefit of Naremore's and Steimle's testimony that soil subsidence could produce pressure on subsurface pipe and could cause breaks in the system, as well as Busch's testimony that the pipe was improperly threaded by LGS at the curb cock. The jury also had before it the testimony of John A. Falcon, Jr., who stated that immediately after the explosion, he saw fire on the lawn running from the sidewalk to the house. According to Falcon, the flames were more prominent near the sidewalk than towards the house. Frank Richardson, another neighbor, stated that after the explosion he saw flames running across the lawn from the sidewalk to the house. A serviceman with LGS corroborated the testimony of the neighbors when he stated that he noticed a "line of little blue flames" between the curb cock and the meter. Charles Schindler, Captain of the Jefferson Parish Fire Division, also *405 observed a gas flame, two or three inches high, on a straight line between the sidewalk and the north side of the Reggio home.
Inherent in the jury verdict in favor of plaintiffs is a jury finding that the break in the gas line pre-existed the explosion. Although LGS's expert, Derickson, testified that ground settlement could not have caused a break in the service line, sufficient evidence exists from the record upon which the jury could properly base such a conclusion.
The record also supports plaintiffs' theory that gas leaking from a subterranean fracture in the pipe migrated through the subsurface soil in the direction of the Reggio home, became trapped in voids beneath the slab of the Reggio home caused by the soil subsidence, migrated up the side of the Reggio home through the air ducts in the overhang and into the attic where the gas was ignited and the explosion took place. According to Steimle, the service pipeline was located approximately 18 inches below the ground surface and was embedded in organic clay soil.[5] Steimle testified that the organic clay material contained voids which were interconnected, forming continuous pathways. In Steimle's opinion, gas would have no difficulty in traveling through this clay soil.
Harley Albert, a chemist, testified that the escaping gas would follow the path of least resistance with some of the gas rising to the surface [6] while other escaping gases would be disbursed through the soil. Based on a hypothetical question, Albert stated that the escaping gas would have a tendency to follow along the cavities existing along the pipeline, from the break to the Reggio home, collecting in the voids and cavities under the slab of the house created by the soil subsidence. According to Albert, because of the natural tendency of the lighter-than-air gas to rise, after the cavities became filled, the gas would rise along the sides of the house through air vents in the overhang of the Reggio residence and into the attic.[7] Generally, Albert's testimony supported plaintiffs' theory in explanation of the cause of the explosion.
However, defendants object to the introduction of Albert's testimony on the grounds that he (Albert) had not been qualified as an expert on the passage of gas through the soil, that hypothetical questions posed to him were based upon reports of a soil expert and metallurgist not introduced into evidence. The trial judge properly overruled defendants' objections to the admissibility of the hypothets. Albert was available for cross-examination, and the trial court properly concluded that the objection was more properly directed to the weight of the evidence than to its admissibility. Albert had been accepted as an expert in the field of chemistry. We cannot say the trial judge abused his discretion by permitting testimony from this witness on the natural propensities of gas. See Carvell, supra.
In an attempt to discredit the subterranean migration theory advanced by plaintiffs, defendants offered evidence that Michael Reggio,[8] approximately one month before the explosion, installed a gas dryer without a permit in violation of a Jefferson Parish ordinance. In an attempt to cast doubt on plaintiffs' theory as to the cause of the explosion, defendants theorize that a leak at the home-installed gas dryer could have caused the explosion. However, no *406 evidence was introduced to show that the installation was defective or that any gas had escaped the dryer connection. The Reggios testified that they had not smelled the odor of gas in their home prior to the date of the explosion. In addition, George Martinsen, an expert in the field of fire investigation, testified that the fire could not have originated from a gas leak at the dryer. Based on physical findings after the fire, he concluded the fire originated in the attic.
On the questions of negligence and causation, LGS has sought to demonstrate weakness in plaintiffs' case by contending that the verdict was based on speculation and by pointing to testimony of LGS experts which relegated plaintiffs' theories to the realm of mere possibility, rather than probability. We reject this position for two reasons. First, we are dealing with a jury verdict of liability and in an appellate review we are limited to the question of whether there is evidence in the record which furnishes a reasonable factual basis for that verdict. Canter v. Koehring Company, 283 So.2d 716 (La.1973). While LGS's experts differed sharply with plaintiffs', and while it may be argued that the former were better qualified and more believable, it is not our function to substitute our own judgment for that of the jury's on these matters. Second, under recent jurisprudence, plaintiffs' proof, though largely circumstantial, was sufficient for the jury to conclude that it was more probable than not for the fire and explosion to be caused as theorized by plaintiffs, and that LGS should have known of the hazard and taken reasonable precautions to prevent the catastrophe. Boudreaux v. American Insurance Company, 262 La. 721, 264 So.2d 621 (1972), and Hanover Insurance Company v. Jacobson-Young, Inc., 294 So.2d 564 (La.App. 4th Cir. 1974).
Under the circumstances, we cannot say the jury erred when it concluded that the explosion and resulting injuries were caused by the negligence of the defendants. Having so concluded, we find it unnecessary to consider plaintiffs' contention that the doctrine of res ipsa loquitur is applicable in the instant case. See Naquin, supra.

QUANTUM
Villere Reggio.
Immediately after the explosion, Villere was taken by ambulance to Charity Hospital where he remained through November 7, 1974, after which he was transferred to East Jefferson General Hospital. He was discharged from East Jefferson on December 24, 1974. Following his discharge, home nursing service was provided on approximately 38 occasions, ending on January 24, 1975. At the time of trial, plaintiff was undergoing weekly physical therapy treatments at East Jefferson.
Villere was admitted to the burn unit at Charity under the care of Dr. Frank DiVicenti, director of the unit. Dr. DiVicenti's examination revealed burns over 25%-30% of the body, including the hands, feet and legs. The doctor testified that, on a daily basis, Villere was sedated, his wounds were cleansed, blisters and foreign tissue were removed. Villere was started on a hydrotherapy program which consisted of placing him in a hydrotherapy tank (whirlpool bath), where his wounds were debrided[9] and cleansed. Antibacterial cream was then applied. Dr. DiVicenti described this procedure as painful.
A specialist in the Charity Hospital burn unit stated that carpeting from the Reggio home had melted onto Villere's feet and was removed with tweezers and scissors. According to the attendants in the burn unit, Villere hallucinated frequently while in the unit.
A physical therapist at East Jefferson General Hospital testified that Villere received medication approximately 30 minutes prior to the commencement of the physical *407 therapy treatment so that he might better tolerate the pain. The treatment consisted of placing Villere on a roller or stretcher, then onto a skiff attached to a hoist which lowered him into the hydrotherapy tank. Prior to placement in the tank, bandages were removed and scar tissue was excised. This treatment was administered on a daily basis and required approximately 30 minutes.
The therapist testified that healing of the burn area was followed by stiffness of the joints and tightness of the skin around the affected areas, i. e., hands, feet and lower legs. The joint stiffness was complicated by Villere's history of arthritis. A program of home exercises was outlined to counteract the stiffness.
Another physical therapist and supervisor of the outpatient clinic at Charity stated that duration of physical therapy and debridement treatment depended, to a large extent, on Villere's pain tolerance. It became necessary, on occasions, to force patients to participate in the painful physical therapy treatments. Villere received 38 physical therapy treatments at East Jefferson General Hospital. The director of the physical therapy department at East Jefferson General was of the opinion that Villere would require treatment for the balance of his life.
Villere, a 67-year old retiree at the time of the accident, was able to recall very little of his stay at Charity Hospital. He stated that because of the serious burns in the area of the ear, resulting in scarred, dead tissue, the lobe of the ear was removed. According to Villere, prior to the injury, he assisted in doing work around the house. However, he was unable to do so following the injury.
Dr. Gustavo Colon, a plastic surgeon, initially saw Villere on November 2, 1974. According to Dr. Colon, Villere had sustained second degree burns over 20% of his body, including the hands, forearms, face and lower extremities. Dr. Colon was concerned about the possible cripping of Villere's hands because of his prior history of arthritis. Treatment of Villere's hands included the use of splints. On March 27, 1975, Villere's last examination by Dr. Colon, the doctor's examination revealed hypertrophic scarring of the upper and lower extremities. He did indicate, however, that on Villere's last visit, his wounds had just about healed with the exception of a few places. As a result of the burns, Villere had difficulty moving his fingers.
It was Dr. Colon's opinion that the marked limitation of hand motion would probably be permanent, but would improve, to some extent, with physical therapy. However, Dr. Colon stated that Villere, at the time of the trial, was totally disabled because of the condition of his hands and though he would make slow, gradual improvement, he would never regain the use of his hands as he knew them prior to the burns. Furthermore, he had problems with swelling of the legs, which required him to wear elastic support stockings. Dr. Colon stated this condition was permanent. According to the doctor, Villere's age was a factor contributing to his slow healing. According to Mrs. Reggio, since the accident, Villere is unable to dress himself or take a bath without her help.
During hospitalization at East Jefferson, Villere suffered a urinary tract infection, requiring insertion of a catheter and a transurethral surgical resection. Medical evidence indicated that the weakened bladder was caused by Villere's general debility, including the long bed rest. The urologist further indicated that although the infection would "clear up", a possibility existed that a repeat operation might be necessary.
Dr. William Pollock, a plastic surgeon, examined Villere on March 17, 1975. According to Dr. Pollock, this plaintiff complained that because of stiffness and tenderness in the joints of the hand, and because of lack of dexterity, he was unable to dress, undress himself or button his shirt by himself. The doctor stated that Villere walked *408 with a decided limp caused from tenderness of the burned scars on Villere's feet and lower extremities. He complained of burning and itching.
In Dr. Pollock's opinion, Villere sustained burns over 28.5% of the body. The facial area revealed very light, healing first degree burns. Deep second degree burns were found on Villere's lower extremities, ears, hands and forearms. The left ear, which sustained a deep second degree burn, had contracted and was deformed. According to the doctor, the burns on Villere's hands caused more functional disability than in other areas of the body. Villere could not fully extend his fingers or flex his thumbs. His feet were tender, requiring the use of house slippers. Reddish-colored scars extended from Villere's knees down-ward to and including the feet.
Based on his examination, Dr. Pollock concluded that Villere was 100% disabled and unable to perform work of any type. According to the doctor, Villere would not be able to use his hands as he did prior to the accident. It was the doctor's opinion that the burn scars would improve over the six months subsequent to the trial, but he could not make a final statement as to Villere's final disability until that time. Also, at the date of the examination, the doctor stated that a likelihood existed that Villere's hands would require corrective surgery. In addition, a possibility existed that plaintiff's lower extremities would require future corrective surgery.
Dr. Walter Prickett, a psychiatrist, examined Villere on April 10, 1975. Dr. Prickett diagnosed Villere's condition as adjustment reaction of adult life, or in laymen's, terms, an adjustment to impairment imposed by the burns. According to Dr. Prickett, Villere had been "thrown for a loop", but that he would be in emotional balance within 12 months. Examination by Dr. J. W. Seastrunk, a psychiatrist, revealed findings similar to those of Dr. Prickett.
Finally, Dr. James D. Day, a plastic and reconstructive surgeon, examined Villere on April 11, 1975, six days before the trial. His examination revealed burned surfaces on Villere's two lower extremities, hands, neck area and face. According to Dr. Day, Villere could unbutton his shirt slowly. He could not take off his elastic stockings. Both hands were scarred, and their motion was limited. Dr. Day found contraction in Villere's thumbs.[10] It was difficult for Villere to grasp objects. Dr. Day was of the opinion that Villere's healing would be a slow process because of the history of arthritis. He estimated a 20% ultimate disability, but was uncertain.
Villere Reggio suffered no loss of earnings as a result of the explosion. While not clear from the record, we compute Villere's past medical expenses in the sum of $13,189.65.[11] Evidently, Villere would undergo future physical therapy treatments, and future surgery was a possibility.
The jury awarded Villere $702,500.00 in damages. We are well aware of our Supreme Court's admonition that amounts of awards in previous "similar" cases are relevant only to determine whether there has been an abuse of discretion, formity.[12] A consideration of the most and not to maintain a framework of unirecent cases where catastrophic damage awards were made leads us to conclude that the general damage award to Villere is excessive. See Harper v. New Orleans Public Service, Inc., 300 So.2d 546 (La.App. 4th Cir. 1974), writs refused, 303 So.2d 182 *409 (La.1974); Morgan v. Liberty Mutual Ins. Co., 323 So.2d 855 (La.App. 4th Cir. 1975); West v. Continental Oil Company, 222 So.2d 104 (La.App. 3d Cir. 1969), writ refused, 254 La. 471, 223 So.2d 873 (1969); Womack v. Travelers Ins. Co., 258 So.2d 562 (La.App. 1st Cir. 1972), writ refused, 261 La. 775, 260 So.2d 701 (1972); Trahan v. Girard Plumbing & Sprinkler Co., 299 So.2d 835 (La.App. 4th Cir. 1974), writs refused, 302 So.2d 618 (La.1974), 302 So.2d 619 (La.1974), 302 So.2d 620 (La.1974); Benefield v. Milchem, Inc., 281 So.2d 771 (La.App. 3d Cir. 1973), writ refused, 282 So.2d 146 (La.1973); Burley v. Louisiana Power & Light Company, 327 So.2d 585 (La.App. 4th Cir. 1976).
While it is well settled in our jurisprudence that great weight is given to the amount of damages awarded by a jury and will not be disturbed absent a finding of an abuse of the much discretion rule,[13] nevertheless, it is the responsibility of the appellate court, in reviewing law and fact, to revise a judgment when circumstances warrant such a finding. See Ballard, supra; Micheli v. Toye Brothers Yellow Cab Company, 174 So.2d 168 (La.App. 4th Cir. 1965).
It is not our intent to minimize the seriousness of Villere's injuries, nor the extended suffering endured by him during his recuperation from the severe burns sustained. Nevertheless, we are influenced to a large extent by the fact that although Villere's injuries did indicate disability of the hands, at the time of trial, the medical experts were in agreement that, with time, Villere's condition would show improvement. Functional disability will involve, to a greater or lesser degree, restricted use of the hands. We are mindful also that the record indicates a deformity of the left ear and that permanent scars remain from the burns. Under the circumstances, we are compelled to reduce the jury award to Villere Reggio to the sum of $300,000.00 in general damages.
Michael Reggio.
Michael was taken by ambulance to Charity Hospital, where he remained until November 2, 1974. Immediately upon arrival at Charity, a tracheotomy was performed and intravenous feeding was begun. On November 2, 1974, Michael was transferred to East Jefferson General Hospital and discharged on November 16, 1974.
Dr. DiVicenti, Michael's treating physician at Charity, diagnosed Michael's condition as burns on the hands, feet and face, constituting approximately 10% of the body surface. The doctor's prognosis for Michael was good. As did Villere, on a daily basis, Michael underwent physical therapy and the maximum possible debridement tolerable. Michael's hands were placed in splints to prevent contraction of the muscles.
Michael received 15 physical therapy treatments at East Jefferson, the last treatment taking place on November 22, 1974.
Substantial pain was suffered by Michael while undergoing debridement, physical therapy and whirlpool baths. According to Michael, pads were placed on the bottoms of his feet in order to assist him in walking to the whirlpool tank. Michael stated that as the pads were being removed, "the pads were stuck to the bottom of his feet and it was like ripping the skin off again". Michael also testified that the scars on his left foot itched him when he remained standing for a long period of time.
Dr. Colon examined Michael on December 11, 1974, and January 9, 1975. His examinations revealed second degree burns over 15%-20% of the body surface, primarily involving the lower extremities, particularly the right foot which suffered deep second degree burns. Also, the doctor found multiple scars over the hands and feet. In Dr. Colon's March 7, 1975 report, he stated that Michael suffered no functional disability. The doctor was *410 uncertain as to the need for further surgery. He indicated in the report that "scar revisions" might be necessary. However, in the doctor's testimony at trial, in April, 1975, he indicated no further surgery was required.
Examination of Michael by Dr. Pollock on March 17, 1975 revealed light second degree burns on the forearms and hands. The deeper second degree burns were located on the feet and lower legs. The doctor found no functional disability. It was Dr. Pollock's opinion that the light second degree burns would disappear within six months, and he anticipated no disability except for the cosmetic problem of residual scarring. According to Dr. Pollock, the itching would continue for six to twelve months.
Dr. Prickett diagnosed Michael's condition as anxiety-neurosis.[14] Michael complained of sleep disturbance and night-mares. He could not tolerate loud noises, because it reminded him of the explosion at home. In addition, Michael could not use safety glasses in his work as a diesel pump mechanic because the glasses caused headaches. Dr. Prickett thought it significant that Michael had no headaches associated with the safety glasses prior to the accident. As a result of the loud noises and safety glasses, Michael found it necessary to change employment. Dr. Prickett recommended psychiatric therapy, once or twice a week, for three to six months, and the use of sleeping pills. It was the doctor's opinion that Michael could resolve his problems without treatment, but rehabilitation would require a longer period of time.
Dr. Seastrunk stated that Michael experienced an emotional change as a result of the accident. However, it was his opinion that Michael did not require further treatment.
The jury awarded Michael $57,500.00. Michael's past medical expenses totalled $3,375.20.[15] It was stipulated that Michael's lost wages amounted to $2,310.00. Dr. Prickett contemplated further psychiatric treatment for Michael at a cost of $480.00 to $960.00. Under the circumstances, and in view of the serious and painful injuries suffered by Michael, we cannot conclude the jury abused its discretion in arriving at the $57,500.00 figure.
Marie Reggio.
Immediately after the explosion, Marie Reggio was taken to the burn unit at Charity Hospital for emergency treatment. She was transferred on October 28, 1974,[16] to East Jefferson General Hospital where she remained until November 9, 1974.
Although the therapist testified that Marie's burns were not as severe as Villere's, the treatment was the same. Marie received 12 physical therapy treatment at East Jefferson General Hospital and two additional while an outpatient, the last one on November 13, 1974.[17] She described the physical therapy treatments as physical torture.
Dr. Colon initially examined Marie on October 22, 1974. His diagnosis was both superficial and deep second degree burns over 15% of Marie's body. Of particular concern to the doctor were burn areas on Marie's arm and knee. According to Dr. Colon, these wounds usually heal without *411 skin grafting, and he did not anticipate any further surgical procedure. Dr. Colon stated that by the time Marie had been discharged on November 9, 1974, the burns had healed without any problems.
Dr. Pollock examined Marie on March 17, 1975. She complained of itching and the unsightly appearance of her right kneecap area. The doctor's physical examination revealed light second degree burns on the right posterior of the arm and light first degree burns on the face. The significant area of deep second degree burns which remained scarred and purple in color was located over the right kneecap area. According to Dr. Pollock, the scars over the knee area, about four inches in diameter, would improve with time. There was no functional disability. However, Marie would be more susceptible to injury in the knee area.
Dr. Seastrunk testified that Marie seemed to be adjusting to the environmental change that occurred as a result of her injuries and the loss of her home. He diagnosed her condition as an adjustment reaction of adulthood with the probability that there would be no need for further psychiatric treatment. Dr. Prickett agreed that Marie did not need any further psychotherapy.
Marie's past medical expenses totalled $2,039.40. She suffered no loss of wages. The jury awarded Marie $127,500.00 in damages. Our examination of the record reveals that the injuries suffered by Michael were as severe as those suffered by Marie. Under the circumstances, we conclude the jury award is excessive. We reduce her general damage award to the sum of $55,000.00.
Nicholas Reggio.
After the explosion, Nicholas Reggio, age 17, also was taken to the Charity Hospital emergency room where lacerations of the left foot and right wrist were sutured. Nicholas was later seen by Dr. Fred Maher on October 28, 1974, November 5, 1974 and November 12, 1974. Dr. Maher removed the sutures and prescribed ointment for the left foot. In addition, Dr. Maher's examinations revealed burns on the right foot. (The record is silent on the degree of burns suffered.)
Examination by Dr. Henry K. Three-foot, an internist, on December 11, 1974, indicated that the injuries had not completely healed. Nicholas failed to return for further treatment although advised to do so by the doctor.
Dr. Pollock saw Nicholas on March 17, 1975. He indicated that Nicholas had suffered a two-inch laceration of the thumb of the right hand. A scar on the left foot measured approximately one inch in length and approximately one-quarter inch in width. Neither scar is functionally disabling. It was Dr. Pollock's opinion that although the scars were permanent, they would become, in time, less noticeable. The doctor found no evidence of burns, but testified that the burns could have healed before his examination. There was no recommendation for future plastic surgery.
Nicholas testified that he had gangrene of the right foot. However, we find no medical support for this diagnosis.
Although not clear from the record, Nicholas's past medical expenses total approximately $140.00. No future medical expenses were anticipated. Nicholas was not gainfully employed at the time of the accident, and suffered no loss of earnings. This plaintiff stated he started a part-time job at a service station in the latter part of January or early February. Under the circumstances, we conclude the jury award in the sum of $17,500.00 is excessive. We reduce the general damage award in favor of Nicholas Reggio to the sum of $5,000.00, together with the past medical expenses incurred.
Accordingly, the judgment in favor of Villere Reggio for general damages is *412 reduced to the sum of $300,000.00, plus $13,189.65 for past medical expenses incurred, or a total award of $313,189.65, together with legal interest. The award in favor of Marie Reggio is reduced to $55,000.00 in general damages, in addition to $2,039.40 for past medical expenses incurred or a total of $57,039.40, together with legal interest. The award in favor of Nicholas Reggio is reduced to the sum of $5,000.00 in general damages plus $140.00 for past medical expenses incurred or a total of $5,140.00, together with legal interest. In all other respects, the judgment is affirmed.
AMENDED AND AFFIRMED.
NOTES
[1] The judgment appealed from also included an award of $43,645.00 in favor of plaintiffs' subrogated fire insurer, an intervenor in the proceedings. The amount of this award is not disputed.
[2] A valve located approximately 18 inches beneath the lawn surface by which the gas is turned on and off.
[3] In the instant case, the service line ran underneath and across the Reggio lawn, connecting LGS's main line to the Reggio gas meter.
[4] Pending rehearing.
[5] Organic soil is that which is composed of decaying animal life, vegetation and tree stumps.
[6] The evidence revealed that the soil approximately three inches below the surface at the Reggio residence was made up of, for the most part, sand, and below that, the soil was organic clay.
[7] The evidence established that air vents were located on the side of the Reggio home and in the rear.
[8] Michael had been employed as a diesel pump mechanic.
[9] Debridement is defined in the record as the cleansing and excising of burned tissue.
[10] According to Dr. Day, contraction means that scar tissue has built up which will multiply and become tight, drawing up and constricting the fingers.
[11] Defendants compute Villere's medical expenses at $13,186.81.
[12] Ballard v. National Indemnity Company of Omaha, Nebraska, 246 La. 963, 169 So.2d 64 (1964); Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963).
[13] LSA-C.C. art. 1934(3).
[14] The doctor defined neurosis as an emotional disturbance, but the individual remains in contact with reality. Anxiety was characterized by an increase in heart beat, blood pressure and breathing rate accompanied by perspiration and fear, symptomatic of anxiety reaction.
[15] According to defendants, the past medical expenses amount to $2,985.20.
[16] Frances Cognevich, medical records receptionst, testified that Marie was transferred to East Jefferson General Hospital on this date. The records of the hospital, however, indicate treatment on October 26 at East Jefferson General.
[17] Marie testified to having six physical therapy treatments as an outpatient.