293 So.2d 631 (1974)
PAGITT WELL SERVICE, INC., Plaintiff-Appellant,
v.
SAM BROUSSARD, INC., et al., Defendants-Appellees.
No. 4424.
Court of Appeal of Louisiana, Third Circuit.
January 25, 1974.
On Rehearing April 17, 1974.
Rehearing Denied May 14, 1974.
Writs Refused June 21, 1974.
*633 Bean & Rush by Warren D. Rush, Lafayette, for plaintiff-appellant.
James G. Dubuisson of Dubuisson, Brinkhaus, Guglielmo & Dauzat, Opelousas, for defendants-appellees.
Before CULPEPPER, MILLER and DOMENGEAUX, JJ.
MILLER, Judge.
Plaintiff Pagitt Well Service, Inc. appeals from a jury verdict rejecting its tort claim against defendant San Broussard, Inc. and Broussard's insurer defendant Travelers Insurance Company. We reverse and award damages.
On September 8, 1971, Ledier Gary, a truckdriver for Broussard's oilfield hauling business, was engaged in hauling workover equipment for Pagitt. After the initial *634 work was done, Gene Pagitt, part owner of Pagitt, requested that Gary travel to another location to pick up a blowout preventer. In the conduct of that operation, Gary dragged the 7000 pound blowout preventer across two flow lines. It was discovered the next day that the two flow lines had ruptured at the "L" joint next to the bent portion of the flow lines, and fresh oil was abundant around the well site. When the damage was discovered some 14 hours later the well was shut in. When the well was placed back in production, average production fell from eighty barrels daily to less than thirty, and the well's water content increased from .2% to approximately 29%.
Neither special verdicts nor a general verdict accompanied by answers to interrogatories was utilized, so we have no insight as to the basis for the jury verdict for defendant. We therefore examine each disputed material issue to determine whether or not the jury committed manifest error.
The issues are: 1) Gary's negligence; 2) Causation; 3) Contributory negligence and assumption of risk; 4) Was Gary a borrowed servant of Pagitt at the time of the injury; and 5) Quantum.
Broussard is engaged exclusively in oil-field hauling. Gary had been employed by Broussard for four years as a truckdriver, and had been a truckdriver for a total of fifteen years. He drove a three-and-a-half ton winch truck equipped with ginpoles sometime referred to as an "A" frame. On September 8, 1971, he was instructed by Broussard's bookkeeper to go to Pagitt's yard in Lafayette to haul oilfield equipment to a location in Anse LaButte. Upon completion of that job, Gary was requested by Gene Pagitt to pick up a blowout preventer at Pagitt's well location in the Port Barre field. Gary knew where it was because he had delivered the blowout preventer to the well site some three weeks before. Gary acknowledged that he was told it would be difficult to pick up this blowout preventer.
Upon arrival at the well site in St. Landry Parish, Gary found the area very muddy. This condition prevented him from parking at a good angle to pick up the blowout preventer. He decided that the best course would be to use the winch to pull the preventer to the truck. He parked the truck four feet from two flow lines. These lines led from the well to the separator and production tanks and were the lines through which production flowed. The truck was parked in such a manner that these lines were between the truck and the blowout preventer.
Gary saw the flow lines and was aware that damage to the lines might cause serious injury. The winch was operated inside the truck cab. He began pulling the blowout preventer toward the truck slowly and would get out of the cab to check to see that the blowout preventer had not reached the lines. In spite of his precautions Gary saw the lines move and then stopped the winch. He discovered that the blowout preventer had come into contact with the flow lines. He then lowered his ginpoles and lifted the preventer. The lines remained bent after the incident, but it was apparent that there was no rupture at the site of the bend. Gary could not find a break caused by the incident. He then completed the loading operation and delivered the item to the Anse LaButte field. Pagitt asked Gary if he had trouble with the load because Pagitt thought that Gary took longer than was necessary. Gary told Pagitt that he didn't have trouble.
Gary deposed that he wanted to report this incident to his employer, but when he returned to Broussard's headquarters all employees had gone home. He decided to report the incident to Broussard the next morning. When he reported to work the next morning, the incident had been reported to Broussard. Gary immediately admitted that he had bent the pipes and proceeded to the well site to view the conditions.
Photographs in evidence taken by Broussard's employee and by Pagitt's employee *635 show the ruts where the truck's rear wheels were parked near the flow lines, the trench dug by the blowout preventer while it was being winched to the back of the truck, and the bend in the flow-lines which resulted from the winching operation. Travelers paid an oilfield service company to repair the damage and clean the well site.
Gary admitted that he been warned at company safety meetings to exercise caution around pressure lines because of the high degree of risk involved. Gary stated that he was worried about hitting the pipe lines because of the possible pressure within. Broussard's office manager acknowledged that the danger of high pressure lines had been discussed at safety meetings.
When confronted with a known hazard, particularly one of extreme proportions, one must exercise a degree of care commensurate with the circumstances. The greater the danger, the greater the degree of care that must be exercised when dealing with that danger. Culpepper v. Leonard Truck Lines, 208 La. 1084, 24 So. 2d 148 (1945).
Gary was confronted with the possibility of rupturing pipes in the vicinity of a producing well. He had been engaged in the oilfield hauling business for fifteen years. He had been warned of the extreme danger of carelessness around pressure lines. The flow lines were readily visible and Gary recognized the hazard but proceeded with the loading operation. He thought the blowout preventer would go over the lines (Tr. 321-322), but his precautions were inadequate. This is particularly so in light of his testimony that if he had lowered his ginpoles before the preventer had reached the lines, the blowout preventer could have been lifted over the lines. This procedure was in fact utilized, but not until after the lines had been struck. Under these circumstances, the jury could not have found that Gary was free from negligence.
Broussard alleges that the injuries complained of were not causally connected to the striking of the flow lines. This allegation is predicated upon three factorsthe break did not occur at the point where the lines were struck; Gary's testimony that there was as much oil on the ground at the well site before the incident as on the following day; and that the sudden break of the flow lines should have produced immediate audible and visible signs due to the 300 pounds of pressure in one line, which signs Gary deposed did not occur while he was there.
The testimony of workmen who repaired the ruptured lines was that the breaks did not occur at the point where the lines were bent, but at the "L" joints several feet from the point of impact. These joints were located underneath a board road and were not visible. The threads of these joints had been stripped, allowing oil and gas to escape. No evidence was introduced to show how such a rupture might have occurred without Gary's negligent act. The fact that the line was not shown to have ruptured at the same place where the blowout preventer struck the line is legally insignificant.
Gary deposed that when he arrived at the well site, there was a lot of oil on the ground. When he returned the next morning with Broussard's general manager to survey the scene, it seemed to him that there was no more oil on the ground than on the previous day. His deposition is off-set by that of Broussard's general manager who testified that it appeared that the oil on the ground was fresh. Gene Pagitt explained that there was some oil on the ground as a result of operations prior to Gary's appearance.
The jury could have been persuaded by Gary's deposition which was read to the jury due to Gary's illness at the time of trial. While we are aware of the great weight to be given to the jury's discretion in determinations of credibility, we are also bound to note that plaintiff is not required *636 to prove causation beyond a reasonable doubt. Plaintiff need only prove causation by a preponderance of the evidence, which in essence means that causation must appear more likely than not. Town of Slidell v. Temple, 246 La. 137, 164 So.2d 276 (1964).
We cannot ascertain the basis for the jury's verdict, since only a general verdict was rendered. We cannot however abdicate the appellate function by dismissing plaintiff's claim on the mere possibility that the jury did not find causation. This is particularly so in light of the fact that the only basis for such a finding would be the reliance upon Gary's deposition and a complete disregard of other witnesses whose testimony was to the contrary. The jury's usual advantage in determination of credibility through its observation of witnesses' demeanor is absent in the case of a deposition. Of further relevance is the fact that no other theory of the cause of the ruptured joints was advanced by Broussard. While great reliance must be placed upon the jury's findings of fact, mere unsupported speculation will not be sufficient to negate causal connection.
Pagitt's expert testified that a sudden rupture of the flow lines should have caused a loud noise due to the 300 pounds of pressure contained in one of the flow lines. Gary deposed that he did not hear such noise, nor did he see oil spewing into the atmosphere. It was found that the rupture occurred in the "L" joints beneath the board road. It is plausible that the rupture could have occurred sometime after Gary's departure, or that the sound was insulated by the built-up board road, or that the leak did not suddenly manifest itself. We note again that the record is devoid of another explanation of causation than Gary's collision with the flow lines.
In light of all the evidence of causation before the jury, it could not have logically concluded that Gary's negligence was not the cause of the unrestricted flow of the well. The flow lines were found to have been ruptured due to the application of external force. The only external force proven to have acted upon the flow lines was the collision with the blowout preventer. The fact that the impact did not cause immediate visible and audible manifestations is discounted by the location of the rupture and the possibility of a delayed breakage due to the weakened joint or a gradually increasing leakage. To require Pagitt to prove causation to a greater degree would result in the imposition of a burden of proof foreign to civil matters.
Broussard alleges assumption of risk and contributory negligence on the part of Pagitt. These charges are based upon Pagitt's knowledge of the muddy and swampy condition of the well site which would make removal of the blowout preventer difficult or impossible and the fact that Gary was knowingly sent alone on a mission which could not be done without assistance.
Extensive testimony was adduced by both parties as to the conditions at the well site. Pagitt attempted to minimize the adverse ground conditions while Broussard attempted to show that conditions were so adverse that merely sending a driver to the site constituted negligence. Under either version, the ground conditions were adverse at least to the extent of making the job difficult.
Both parties urge that it was incumbent upon the other to see to it that Gary acquire additional help. Regardless of who would be chargeable with the duty of providing Gary additional help, such help would certainly have appeared prudent.
Conceding these factors in Broussard's favor, negligence on the part of Pagitt was not the proximate cause of the injury. Gary deposed that he could have picked up the preventer, without additional help. Under the conditions that existed, the accident would not have happened had he lowered his ginpole before he struck the line rather than after. It is difficult to find *637 Pagitt negligent for sending Gary to pick up the preventer without help when Gary's own testimony affirmatively states that the preventer could have been picked up safely.
The jury could not have reasonably found that Pagitt was contributorily negligent or had assumed the risk.
Finally, Broussard asserts that at the time of the accident, Gary was acting as a borrowed servant, and that his negligence is chargeable to Pagitt alone. This allegation is founded upon the fact that the original services requested by Pagitt from Broussard did not include the hauling of the blowout preventer from the Port Barre location. When Gene Pagitt requested Gary to pick up the preventer, Gary had no authority to so act, and proceeded in the work, not as an employee of Broussard, but as a servant pro hac vice of Pagitt.
Gary deposed that it was standard procedure for him to engage in additional hauling tasks for customers after completion of the initial job. After completion of the additional work, he would inform Broussard's bookkeeper, and the customer would be billed at the standard rates.
David Suire, Broussard's office manager, testified that the only work ordered by Pagitt that day was for a shipment from north Crowley to Anse La Butte. He stated that a driver has no authority to undertake additional missions. No one, he stated, called him on that day for authority to enter into a contract for the Port Barre job. Gary, he stated, was merely confused about his authority to take additional orders. Regardless of Gary's authority, Broussard saw fit to bill Pagitt for the job at the ordinary rate, and was paid.
The right to control is the key element in determining whose servant a particular employee is for purposes of liability under the doctrine of respondeat superior. Our courts have consistently held that there is a presumption that the general employer retains control and remains liable for the negligent acts of his employee. If the general employer seeks to establish that his employee has become the borrowed servant of another, he must establish by a preponderance of the evidence the termination of his right to control and the assumption of that right by the borrowing employer. See, Universal Engineers & Builders, Inc. v. Lafayette Steel Erector Corp., 235 So.2d 612 (La. App. 3 Cir. 1970), and the numerous cases cited therein.
The record fails to show a termination of the right of control by Broussard and an assumption of such control by Pagitt. Both Gary and Suire testified that truck-drivers are instructed by Broussard on how to conduct oilfield hauling operations. Gary and Gene Pagitt testified that Gary was requested to pick up the blowout preventer, but was not instructed how to go about doing so. Suire also stated that Pagitt would simply tell drivers what to pick up, but would not tell them how to do it.
Broussard is engaged in the business of oilfield hauling. One of its employees undertook to do additional work within the scope of that business, and Broussard was paid accordingly. As a result of the conduct of that work, damage was incurred. Broussard was not shown to have surrendered its control or right to control the conduct of that work, and Pagitt was not shown to have done more than request its undertaking. The jury could not have reasonably found under those circumstances that Gary had become the borrowed servant of Pagitt.
The Jury verdict in favor of defendants is reversed.

DAMAGES
Pagitt seeks the cost of drilling a new well or, alternatively, the cost of reworking the well plus damages for reduced production from the date of the accident to the date of trial. As proof of injury, Pagitt offers undisputed testimony that the *638 production from its well reduced dramatically after September 8, 1971. Expert testimony on behalf of Pagitt indicated that the sudden release of pressure caused by the break caused the well to flow freely until it was shut in, with resultant subsurface damage to production caused by an accumulation of sand.
Pagitt's well (which Pagitt made productive by working over the well) suffered a decrease in production after the September shutdown. When the well started to flow in July, it had an allowable of 101 barrels per day. It produced approximately 80 barrels daily in July and August. After the September breakdown until the date of trial, the well produced from 20 to 25 barrels of oil per day. It was established that some of the decrease was due to mechanical problems not related to the incident, and that more could have been produced absent the mechanical problems. At trial, production was increasing and it was the considered opinion of the experts that as long as production continued at the 20-25 barrel per day rate, no other work should be attempted. Also relevant to the issue of damages is the fact that the well increased its percentage of salt water content from .2% to 29%.
Pagitt's expert testified that such a rapid decrease in production could only be explained by the well's unrestricted flow until the time it was shut-in after the accident, a period of some 12 to 14 hours. Such a phenomenon was, in his opinion, the cause of the reduced productivity. Broussard's experts, on the other hand, tend to discount the possibility of such an occurrence reducing productivity, but nevertheless concede that such a result is possible.
We conclude that the well was proven to have been damaged by the accident. We find the timing of the accident and the reduced production cannot be ignored. This fact, combined with Pagitt's expert's testimony establishing the causal link between the accident and the reduced productivity, convinces us that the accident reduced the productivity and the value of the well.
Pinpointing the exact value of Pagitt's loss is a more perplexing problem. Estimation of damages where as many variables are involved as occur in oilfield production involves a certain amount of conjecture. Although experts on both sides differed on virtually all significant factors, it was generally conceded that opinions concerning the estimated life and relative productivity of a Port Barre field oil well are shaky foundations to rest expert reputations upon. Nevertheless, where, as here, actionable injury has been shown, it is within the sound discretion of this court to award such damages proven just and equitable upon the record by a preponderance of the evidence. Jordan v. Travelers Insurance Company, 257 La. 995, 245 So.2d 151 (1971).
Pagitt claims it is entitled to the $80,000 cost of drilling a new well. We find, however, that both Pagitt's and Broussard's experts testify that such a step would be unfeasible because of the difficulty in finding the same pocket of oil. Since the record does not establish that drilling a new well would be a feasible undertaking, Pagitt is not entitled to the cost of drilling a new well.
Pagitt's alternative demand is for the reduced productivity of the well and for the costs of reworking the well.
Experts for both sides were familiar with the nature of the Port Barre field. All testified that the field is an old one, and is extremely unpredictable because of numerous fault lines. All experts agreed that estimates of future production are highly speculative. The evidence indicates that, even before the September decrease caused by the break, production was decreasing. Similar dramatic decreases in production are routinely experienced in that field for unexplained reasons. Broussard's expert testified that of the thirty-seven wells and six stripper leases (which *639 may each contain more than one well) in the Port Barre field, only twelve produce 25 or more barrels per day.
The most controverted issue relevant to productivity was whether or not the well was in the same reservoir as a nearby well drilled to the approximate depth of Pagitt's well. Pagitt's expert concluded from electrologs that they were, and that the nearby well was draining the reservoir and thus infringed upon Pagitt's ultimate recovery. The area is not unitized because of the numerous fault lines. Broussard's experts concluded from the same electrologs that the wells were not drawing from the same reservoir. They point convincingly to the differing water-levels demonstrated by the electrologs. Broussard thus contends that, in spite of the decreased rate of production, Pagitt's ultimate recovery will not be affected.
Considering the unpredictable nature of the Port Barre field, the numerous faults known to exist, and the speculative nature of estimating decreased production, a phenomenon which may occur at any time and which had begun to manifest itself prior to the accident, and the convincing reasons assigned by Broussard's experts, we do not find damages for decreased productivity are proved.
We do find, however, that some allowance should be made for the costs of reworking the well. The damage caused by the accident was to the subsurface structure of the well. This is the sort of damage normally remedied by work-over operations. While Pagitt's expert testified that an attempt to rework the well could result in loss of all production, he did concede that the length of time a well may normally operate without requiring a work-over fluctuates widely. Pagitt's expert had dealt with the neighboring well mentioned above and had recommended two reworkings of that same well within a year (Tr. 370). He further testified that some wells in that field have been producing 20 to 25 years in one sand.
We therefore find that Pagitt should be allowed the sum it asked for in its original petition for reworking its well, $20,000. We further find that Pagitt is entitled to the 55 barrels of production spilled on the surface while the well flowed freely. The net value it received per barrel was $2.56, resulting in an award of $140.80 for this item.
It is therefore ordered that the judgment in favor of defendant Sam Broussard, Inc., and The Travelers Insurance Company be set aside. It is hereby Ordered, Adjudged, and Decreed that defendants Sam Broussard, Inc., and The Travelers Insurance Company be condemned to pay Pagitt Well Service, Inc., the sum of $20,140.80, plus interest from date of demand. All court costs both at trial and on appeal are to be borne by appellees.
Reversed and rendered.
DOMENGEAUX, Judge (dissenting).
I respectfully submit that the record contains sufficient evidence, particularly on the question of causation to preclude the majority holding of manifest error. I would affirm the jury verdict.

ON REHEARING
MILLER, Judge.
The rehearing was granted to reconsider the questions of contributory negligence, assumption of risk, and damages. Finding that the jury could have reasonably concluded from the evidence before it that no enduring damage was done to Pagitt's well, we amend the award to $140.80.
We chose to reconsider the issues of contributory negligence and assumption of risk for purposes of clarification. One fact led to our rejection of the argument that the jury could have reasonably found either defense available. This was the undisputed testimony of Gary himself, the only witness to the accident. He admitted that in spite of the existing conditions and without additional help, he could have lowered the ginpoles on his truck to prevent striking *640 the pipes. While winching the load, he watched the pipe to see if and when it moved. From this testimony we again conclude that the defenses of contributory negligence and assumption of risk were not proved.
The same factors are considered in determining contributory negligence as in determining negligence. Thus, there must be a causal connection between plaintiff's alleged breach of duty and the injury complained of. Theunissen v. Guidry, 244 La. 631, 153 So.2d 869 (1963). Even if Pagitt was under a duty to send additional help or to refrain from sending Gary on the mission under unfavorable conditions, the breach of these duties has no causal relationship to the injury sustained. Gary specifically stated that he could have lifted the preventer safely before the pipe was struck. The procedure thus could have been performed safely in spite of both the lack of assistance and the ground conditions.
In order for assumption of risk to constitute a valid defense, two conditions must first be satisfied. Plaintiff must know and understand the particular risk he is incurring, and his choice to assume the risk must be entirely free and voluntary. Prosser, Law of Torts, § 67 (1964). "The determination of whether a plaintiff has assumed a risk is made by subjective inquiry, whereas contributory negligence is determined objectively under the reasonable man standard. See Restatement (Second), Torts § 496 [D] (1965); Symposium: Assumption of Risk, 22 La. L.R. 1-166." Langlois v. Allied Chemical Corporation, 258 La. 1067, 249 So.2d 133 at 141 (1971).
The jury could not have concluded that Pagitt assumed the risk of the kind of injury incurred. Pagitt may be chargeable with knowledge as to the dangers inherent in the ground conditions and in lack of personnel, but it is inconceivable that it was chargeable with knowledge of the particular manner in which this accident occurred. Furthermore, Broussard was required to establish their affirmative defense by a preponderance of evidence. Langlois, supra. We find nothing in the record to infer that Pagitt, in sending Gary on the mission to remove the preventer, knew that such an undertaking would involve danger to the flow lines.
In our original opinion we failed to adequately consider that the jury may have based its general verdict on the finding that Pagitt failed to prove pecuniary loss from the accident. The jury could not have reasonably concluded that damages were not forthcoming for the oil lost before the well was shut in. However, the jury could have reasonably concluded that both future production and the necessity of a workover operation were not proven. We therefore reduce the award to $140.80, representing the amount of oil lost before the well was shut in.
We base our decision upon the wide latitude of discretion allowed the jury in determining damages. LSA-C.C. art. 1934(3). Absent manifest error, we must affirm. The jury did not commit manifest error in finding that no damages (other than the oil spilled) were sustained.
The most persuasive factor in reducing damages is the evidence presented by experts testifying on behalf of both sides as to the nature of the Port Barre Field. All witnesses including the experts agreed that the Port Barre Field is old and unpredictable. The field contains many wells with widely varying productivity, in terms of both useful life and volume produced as to both daily and total production. The jury could have been reasonably convinced that Pagitt failed to prove the accident caused either damage to the well or a reduction in production.
There was no expert testimony to suggest that a work-over was warranted as of the trial date. A work-over undertaking could result in loss of all production. The jury was confronted with testimony to the effect that under normal operations wells *641 in this field need reworking at highly unpredictable intervals. A nearby well had been reworked twice since Pagitt's well was damaged. The jury had before it compentent evidence showing that ultimate production would be unaffected by the accident, since the well was not being drained by adjoining wells.
There is no manifest error in the jury determination that Pagitt failed to prove damages for the cost of reworking the well or for loss of production.
The judgment in favor of Sam Broussard, Inc. and The Travelers Insurance Company is set aside. It is hereby Ordered, Adjudged, and Decreed that defendants Sam Broussard, Inc., and The Travelers Insurance Company be condemned to pay Pagitt Well Service, Inc., the sum of $140.80, plus interest from date of demand. All court costs both at trial and on appeal are to be borne by appellees.
Reversed and rendered.
DOMENGEAUX, J., dissents and adheres to the same position taken on the original majority opinion.