515 So.2d 589 (1987)
Harold PRICE, Sr.
v.
COPPUS ENGINEERING ASSOCIATES, et al.
Stanley SPEARS
v.
COPPUS ENGINEERING ASSOCIATES, et al.
Nos. 86 CA 1520, 86 CA 1521.
Court of Appeal of Louisiana, First Circuit.
October 14, 1987.
Writ Denied December 18, 1987.
*590 Randall A. Shipp, Baton Rouge, for plaintiff-appellant Harold Price, Sr., Stanley Spears.
Albert C. Miranda, Metairie, for intervenor-appellant Royal Globe Ins. Co.
James W. Pierce, Baton Rouge, for intervenor-appellee Althea G. Spears.
Gene Palmisano, New Orleans, for defendant-appellee Monterey Pipeline Co.
W. Luther Wilson, Baton Rouge, and John Swanner, Baton Rouge, for defendant-appellee Harris Calorific Co.
Before WATKINS, CARTER and CHIASSON,[*] JJ.
CARTER, Judge.
This is an appeal by appellants, Harold Price, Sr. and Stanley Spears, who were severely burned in the course and scope of their employment with Union Tank Car Company (Union).

FACTS
In 1979, Union was in the business of repairing railroad tank cars on its premises in East Baton Rouge Parish. Employees repaired the tank cars at work bays inside the Union facility, which consisted of a large geodesic dome with thirty-six separate repair stations arranged in a circle. Each repair station had a set of railroad tracks, with an island between every two tracks. On the side of the dome within the circle itself is a pit. Piping comes into the dome and supplies natural gas and other gases and oxygen. Each station has hook-ups for equipment that supplies oxygen and natural gas, as well as water, and other liquids. A red hose is connected to the gas or fuel side, and the connection for the oxygen side is a green hose. The two hoses are then connected to heating torches and/or cutting torches which are used to repair the tank cars.
On November 6, 1979, appellants, while repairing the interior of a tank car, were severely burned when a fire erupted within the tank car's interior. At the time of the accident, appellants were attempting to repair a valve on the tank car with the use of *591 a cutting torch and a heating torch, both manufactured by Harris Calorific (Harris).
The natural gas was supplied and delivered in an unodorized state to the Union facility by the Monterey Pipeline Company (Monterey). Monterey owned and maintained the pipeline up to Union property, and Union owned and maintained the pipeline from its property line to all points on its property.
The accident spawned two suits against numerous defendants, which were consolidated for trial on August 27, 1980. In their original petition, dated March 14, 1980, appellants named Coppus Engineering Corporation and Mine Safety Appliances Company as defendants. Subsequent to this filing, appellants filed their first supplemental and amending petition on November 6, 1980, naming thirteen additional defendants, including Harris. In that petition, appellants alleged that the cutting torch in use at the time of the fire was defective and was the cause of their injuries. In a second supplemental and amending petition filed on November 30, 1982, appellants named Monterey as a defendant, alleging that Monterey was liable for failure to supply odorized gas to Union.
Various pleadings were filed by parties including Royal Globe Insurance Company and the former spouse of appellant Spears, namely Althea Gail Spears.[1]
All defendants, with the exception of Harris and Monterey, were dismissed via motions for summary judgment or peremptory exceptions raising the objection of no cause of action.
On February 27, 1984, the trial court granted Monterey a partial summary judgment, finding that Monterey had no statutory duty, based on federal or state law to odorize the natural gas supplied to Union.[2] No appeal has been taken from this judgment, which is now final.
On December 9, 1985, trial was held. In response to a motion for a directed verdict, the trial judge granted Monterey's motion, finding that appellants failed to establish that Monterey was negligent in failing to odorize the gas. Specifically, the trial judge found that the appellants failed to establish that Monterey owed them any duty or that Monterey breached any duty. At the conclusion of the trial, the jury found that the cutting torch manufactured by Harris was not defective and rejected appellants' demands against Harris.
Accordingly, the trial court rendered judgment on December 19, 1985, dismissing the suits against Harris and Monterey.
The only issues for appeal are as follows:
1. Whether the trial court erred in directing a verdict in favor of Monterey; and,
2. Whether the jury was manifestly erroneous in its finding that the cutting torch, manufactured by Harris was not defective.

DEFECTIVE CONDITION OF CUTTING TORCH
In Halphen v. Johns-Manville Sales Corporation, 484 So.2d 110 (La. 1986), the Louisiana Supreme Court succinctly set forth the law regarding products liability. In order to recover from a manufacturer because of an allegedly defective product, the plaintiff must prove that the harm resulted from the condition of the product, that the condition made the product unreasonably dangerous to normal use, and that the condition existed at the time the product left the manufacturer's control. The plaintiff need not prove negligence by the maker in his manufacturing since the manufacturer may be liable even though it exercised all possible care in the preparation and sale of its products. Halphen v. Johns-Manville Sales Corporation, supra.
The manufacturer's ability to know the danger of its product is immaterial since the product is on trial and not the knowledge or conduct of the manufacturer. Further, additional liability theories have developed allowing plaintiff to recover *592 when the manufacturer fails to give adequate warning or to adopt an alternative design to make the product safer. Under these theories, the knowledge available to the manufacturer when it designs, manufactures, and markets the product may be material. Halphen v. Johns-Manville Sales Corporation, supra.
An essential element of a plaintiff's case under the strict products liability theory of recovery is proof that the defendant's product was unreasonably dangerous to normal use. The method of proof of this element varies under each theory. In Halphen v. Johns-Manville Sales Corporation, supra, the discussion of the theories of recovery in strict products liability actions are broken down into products which are unreasonably dangerous per se and products which are unreasonably dangerous in construction or composition when they leave control of the manufacturer, in that they contain an unintended abnormality or condition which makes them more dangerous than they were designed to be. Further, although a product is not unreasonably dangerous per se or flawed by a construction defect, it may still be unreasonably dangerous if the manufacturer fails to adequately warn about a danger related to the way the product is designed. A manufacturer is required to provide an adequate warning of any danger inherent in the normal use of its product which is not within the knowledge of or obvious to the ordinary user.
Considering the above principles, we must give great weight to the factual conclusions arrived at by the trier of fact and reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed even though the appellate court may feel that its own evaluations and inferences are reasonable. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978); Canter v. Koehring Company, 283 So.2d 716 (La. 1973); Sparacello v. Andrews, 501 So.2d 269 (La.App. 1st Cir. 1986), writ denied 502 So.2d 103 (La.1987); Lucido v. Aetna Life and Casualty Company, 411 So.2d 608 (La.App. 1st Cir.1982). As noted by this court in Lucido v. Aetna Life and Casualty Company, supra at 610, "[t]he reason for this well-settled principle of review is based not only upon the trial court's better capacity to evaluate live witnesses (as compared to the appellate court's access only to a cold record), but also upon the proper allocation of trial and appellate functions between respective courts." See also Virgil v. American Guarantee and Liability Insurance Company, 507 So.2d 825 (La. 1987).
On the day of the accident, appellant Stanley Spears was working as a tank repairman inside a tank car and was attempting to replace a valve. The inside diameter of the tank car is approximately ninety-four and one-half inches. After several failed attempts to manually unscrew the valve, Spears used a heating torch. He alternately sprayed oil and heated the valve. Finally, he removed the stud from the valve and heated the valve casing. After removing the valve, Spears exited the tank car and disconnected the heating torch from the oxygen and gas line outside the tank car. The torch itself was left inside the tank car. Spears re-entered the tank car with a new valve and subsequently realized that the stem on the new valve did not fit the particular tank car. He informed his supervisor and was instructed to prepare the tank car so that the stem could be cut. Spears was told that a welder would be sent to cut the stem and to assist Spears in replacing the valve. After obtaining a cutting torch, Spears hooked it to the gas line and oxygen line outside the tank car and lowered the torch, unlit, into the tank car. Spears admitted that it was not possible for the booster handle to be depressed by merely laying the cutting torch on the floor of the tank car. Approximately 30-45 minutes elapsed between the lowering of the torch into the tank car and the arrival of the welder, appellant Harold Price.
Spears testified that before he and Price began working, they were aware that there was insufficient ventilation in the tank car and that the main ventilating system was inoperable. Spears further stated that they did not have time to look for an auxillary ventilating system, and they commenced *593 the work in spite of this. At no time did Spears smell any unnatural odor such as the malodorant used in natural gas. While Price held the stem, Spears testified that he knelt down and lifted the cutting torch. Spears lighted it, and, after setting the desired flame level, he pressed the oxygen booster handle. As he did, a piece of slag flew off the stem, hit the side of the tank car, and flames came back toward him. Spears testified that his hair caught on fire initially and recounted that maybe his gloves were exposed first. He finally admitted it was difficult to determine where the fire started. Spears testified that he ran to the end of the tank car, ran back, found the ladder, and eventually exited the tank car. Spears claimed that he saw flames coming out of the manhole cover at a height of 3-4 ft., and after Price exited the car, they rose to a level of 30-40 ft.
Harold Price was classified as a code welder and worked in the tank car repair department at Union. Upon arriving at the particular tank car Spears was working on, Price testified it was most likely that he handed some tools down to Spears in the tank car. He testified that Spears picked up the cutting torch from the floor, lit it, and as Price held the welding rod in his hand (about 45 seconds to a minute later), the slag came off the rod and hit the side of the tank car and the flame jumped back onto Spears' head. Price doesn't remember seeing Spears' gloves catch on fire. As best that he could recall, 10-15 seconds elapsed between the time the fire broke out and the time Spears exited the tank. Price was right behind Spears in exiting the tank car, and he remembered going through flames. Once out of the tank car, he looked up and saw flames shooting out of the tank car 20-40 ft. high. Price recalled that it was very hot and humid inside the tank car, and this was usual when a heating torch had been used. He did not recall smelling the malodorant in natural gas or hearing anything that sounded like any type of air, oxygen or gas leaking. He testified there was no loud explosion preceding the time Spears' hair caught on fire.
Dennis Howard, a safety consultant called by appellants, qualified as an expert in safety management and industrial safety. He stated that he saw a "potential" flaw in the inner design of the cutting torch that could allow the oxygen lever to be depressed by the weight of the torch itself. Howard stated that, in an oxygen enriched environment, materials ignite at a lower temperature and burn very rapidly. He stated that oxygen is not a fuel but an accelerator and, in his opinion, the most likely source of oxygen was the cutting torch. He felt that leaks could have contributed to the fire but not exclusively. He had no evidence that the torch leaked. However, Howard said leaving the oxygen valve open for about half an hour could have an impact on the environment of the tank car. He admitted that the torches were not tested with the same hoses after the accident and that the hoses could have been a source of the leak. He testified to the use of mercaptan (malodorant) to "keep people from making mistakes." In his opinion, using unstenched gas in an ordinary work environment created a significant and serious danger, and he assumed that there was natural gas in the tank car from the "violence of the blaze." Finally, he stated that ventilation was needed in the tank car to keep the men comfortable and to change the atmosphere by moving out any residual gases.
Dr. Clayton Callihan, retired professor of Chemical Engineering and now professor emeritus of Chemical Engineering at LSU, qualified as an expert in Chemical Engineering and also qualified as an expert in fires. Dr. Callihan examined both the heating torch and the cutting torch and subjected both to exhaustive tests. He determined that there were no leaks in the heating torch, either through the gas side or through the oxygen side. Further testing showed no leaks in the gas side of the cutting torch, but Callihan did find four minor leaks in the oxygen side of the cutting torch, although he said that the leaks may have been the result of replacement hoses installed after the fire. Callihan also noted that two of the small leaks could have been corrected by tightening the *594 check valve. There was another leak underneath the oxygen valve cap, and a final leak came through the torch tip itself. Callihan measured exactly how much gas was released per unit of time by all of the four minor leaks. The total release was determined to be about 15 gallons per hour. Since the tank car was full of air and air is 21% oxygen, the tank car already contained about 2,500 gallons of oxygen. The additional 15 gallons per hour of oxygen from the leaks would have no effect whatsoever on burning. Therefore, Callihan concluded that the leaks in the cutting torch had nothing to do with the fire because that small amount of additional oxygen which could have escaped would have no effect on the overall oxygen content in the tank car.
Dr. Callihan was also of the opinion that natural gas was not involved in any way in the fire. He stated that if there had been a natural gas leak in the tank car when Spears initially lit his torch, there would have been a "boom." He stated:
[I]t would have madejust as though you turned your oven on and let the gas flow a few minutes before you tried to light it, and if you've never done it don't do it, uh, because it's not a very wise thing to do. If you let gas accumulate and then you ignite it then the propagation rateknown that gas ignites at about 900 degreesso if natural gas had burned they would have hadthese men would have had third degree burns on their faces, wherever was exposed, because it burns so intensely and so rapidly.
Re-emphasizing, he said that at the moment Spears would have lit that torch, there would have been an ignition. He would not have been there for 30 seconds heating and then cutting. Further, the ignition would have caused an explosion, and both men would have had the same degree of ignition and injury. All exposed areas would have had third degree burns. Further, their lungs would have burned.
Dr. Callihan opined that the accident occurred as the result of Spears heating the bolt on the valves and spraying the bolt with oil. As appellant Spears sprayed oil on the hot bolts, the oil vaporized and boiled just like water does and condensed just as water does, settling on Spears' hair and clothing. It also settled on appellant Price and diffused throughout the tank car. Callihan's opinion was that Spears turned off the natural gas valve on his heating torch, but not the oxygen valve. He further opined that the torch was found with the oxygen valve open and that the activities of Spears had taken enough time that the tank car partially filled with oxygen. He estimated that in roughly 30 minutes, the oxygen freely flowed into the tank car from the heating torch and produced approximately 1500 cu. ft. of oxygen per hour. Further, considering that the tank car was initially 21% oxygen or 336 cu.ft., there would be 1100 cu.ft. out of a total cu.ft. in the tank car of 1600, making approximately 70% of the atmosphere in the tank car oxygen. The burning rate would be triple the normal burning rate, an increase from 2" per second to 6" per second. Callihan attributed the speed with which Spears caught fire and the fact that Price did not catch fire immediately to the oxygen enriched atmosphere.
Callihan performed experiments to determine the effect of increased oxygen on cotton fabric, blue jeans, etc. and found that other items burned rather than smoldered.
In a third set of experiments, he determined that, had the cutting torch with the four leaks been inside the tank car for 30 minutes with the oxygen valve off and only the four leaks releasing oxygen into the atmosphere, the maximum oxygen release would be 6.7 gallons of oxygen or an increase of .067%, an amount which was too small to measure in his test flask. He further testified that if the torch had been left leaking in the tank car for 24 hours, the oxygen enrichment of the contents of the tank car would be only 3%. According to his experiment, 3% enrichment of oxygen did not affect the flammability in any test run.
Dr. Callihan further testified that the cutting torch and the oxygen and natural gas hoses to the cutting torch were permanently *595 connected to the oxygen pipe and to the natural gas pipe. Since Price had stated that he had disconnected two lines, Dr. Callihan concluded that Price obviously disconnected the lines to the heating torch and left the hose to the oxygen supply on the cutting torch open. Dr. Callihan's conclusion was that the small leaks in the torch did not cause or contribute to the fire in any way whatsoever. He reached the same conclusion if the booster handle on the cutting torch had been taped down so there would have been a free flow of oxygen out of the cutting tip of the torch (30 minutes). He repeated that if the booster handle of the cutting torch was taped and dropped into the tank car for 30 minutes, it would not raise the oxygen level to a point to have any significant impact on the rate of burning.
Albert Ross, chief engineer at Harris, testified that Harris designs new products and they take that from a conceptual point through the design and into production. They also regularly update the product to meet present day technology. The company also complied with underwriting laboratory standards in the design and safety of the torches, and every torch made is checked before it leaves the plant. The particular cutting torch used in the November 6th incident showed severe wear and some parts were worn, but none affected the torch's function. The torch had been in service for approximately 20 years. Ross explained that the two valves on the cutting torch controlled the flow of oxygen and gas travelling into the torch. The booster handle controls additional oxygen to enhance the cutting powers of the torch. Without a booster handle on the oxygen valve, it would be impossible to cut steel. The Harris torch was designed in such a way that when it is laid down in any position, the two butterfly valves controlling the oxygen and gas and the tip serve as a tripod to protect the booster handle from being inadvertently depressed. Ross was of the opinion that the risk was very small that the handle would be inadvertently depressed and that adding any type of guard would be unnecessary.
John Gosa, an employee of Union at the time of the accident, was the chairman of the company's safety committee. He witnessed Spears and Price exiting the tank car after the accident from about 65 to 70 feet away and did not notice any fire coming out of the tank car other than the flames on Price. He testified that both the cutting and heating torches were found inside the tank after the fire. He found one of the valves on the heating torch open and the cutting torch's oxygen valve partially open. Gosa described the cutting torch as having two thumbscrews, one for fuel gas and one for oxygen. If both valves were closed, there would be no flow of oxygen or gas, but even if the valves were closed and the oxygen trigger was depressed, there would be a flow of oxygen. He explained that the booster handle on the cutting torch could become accidentally depressed if placed face down or if it bumped against the pipe as he witnessed previously in an incident. Oxygen could escape causing a noise, but the degree of noise would depend upon the oxygen pressure.
Co-employee, Curtis Graham, a liquified gas car repairman, witnessed Spears and Price coming out of the tank car. He did see flames coming out of the tank car before Price exited the tank car. After Price exited, about a minute later or more, he saw flames coming out of the tank car. His opinion was that the hoses burned completely thus causing the flames to grow to such a size as to come out of the tank car. He explained that when the hoses burned, they separated from the torches and a great amount of gas and oxygen was released into the tank car.
The safety manager of Union, William Robert Finkler, testified that he was in charge of developing safety programs and investigating accidents. Upon his investigation of the torches, the cutting torch was found with the oxygen valve open and the gas valve closed. The heating torch was also found with the oxygen valve open and the gas valve closed. He testified that certain company safety rules were not followed in this case. The tank car was not ventilated and should have been for the *596 work being performed on the day of the accident. Further, there should have been only one torch in the tank car at any one time. The torches should have been lowered into the tank car already lit, and there should have been a safety man on the top of the tank car at all times while "hot work" was performed. There should have been a wrist harness in use to help pull the workers up out of the tank car in the event of an emergency.
Testifying as to the design of the particular cutting torch, Finkler admitted that a safety guard added to the booster handle would be an enhanced safety feature, but stated that he never received any complaints regarding the lack of a guard or knew about any dissatisfaction with the cutting torch because of the lack of a guard.
In applying the standard of review to the case sub judice, we cannot say that the finder of fact (jury) was manifestly erroneous in its findings and further conclude that the findings are obviously correct. The only testimony contrary to all other experts and fact witnesses was that of appellants' safety consultant, Dennis Howard. Howard was of the opinion that the weight of the cutting torch could depress the "booster lever" and release pure oxygen into the environment creating a significant fire hazard and that this theory is consistent with the factual testimony of appellant Spears regarding the fire. According to Howard, the introduction of pure oxygen into a tank car environment created a risk of severe harm or death and was a deceptive hidden danger. The presence of oxygen takes all rules of knowledge and understanding away because of the lack of understanding of the temperature at which things ignite. He further testified that, in his opinion, the initial ignition was caused by an oxygen enriched environment and the cutting torch was the most likely source.
The jury concluded that the cutting torch was not defective and was not the cause of the fire. The oxygen booster handle on the cutting torch is a necessary part of the torch. It is likened to an accelerator pedal on a carit makes the tool perform its cutting function. It is not hidden or secret, and, according to the testimony of all parties except Mr. Howard, is not defective. Spears knew how the cutting torch worked and the function of the booster handle. There is no evidence that the oxygen booster handle was accidentally depressed, and even if it had been, according to the testimony of Dr. Callihan, it would not have provided sufficient oxygen in the time available to make any significant difference on the resulting flammability of the tank car environment or the resulting fire. For ordinary purposes, it appears that the lever was well protected from accidental depression and apparently the total design of the tool was satisfactory and had been for the some 20 years it had been in service.
Therefore, considering any of the tests provided for in Halphen, we cannot say that the jury erred in holding that the cutting torch was not defective. Since the cutting torch was not defective and was not unreasonably dangerous to normal use, the finding of the jury and judgment of the trial court resulting therefrom must be affirmed.

DIRECTED VERDICT
Prior to trial, Monterey filed a motion for partial summary judgment on the basis that Monterey had no state or federal duty to odorize the gas supplied to Union. The trial court granted a partial motion for summary judgment holding that Monterey had no state or federal duty to odorize the gas which it supplied to Union. Further, during the trial all parties stipulated that Monterey supplied natural gas to Union in an unodorized form; that there was no specific state or federal statutory duty requiring Monterey to odorize the natural gas; and, pursuant to agreement between Monterey and Union, Union was solely responsible for stenching or odorizing the natural gas supplied by Monterey.
Since the issues disposed of in the motion for partial summary judgment have become final, the only issue at trial as concerns the correctness of the directed verdict was, absent a state or federal statutory *597 duty, whether Monterey was negligent in failing to odorize the natural gas which it supplied to Union. In granting Monterey's motion for directed verdict, the trial court concluded that, when the evidence was viewed in the light most favorable to appellants, reasonable jurors could not have concluded that Monterey was negligent in failing to odorize the natural gas supplied to Union.
LSA-C.C.P. art. 1810 provides that a party may move for a directed verdict at the close of the evidence offered by its opponent. The motion for directed verdict is appropriately granted in a jury trial when, after considering all evidence in the light most favorable to the opposition, it is clear that the facts and inferences resound so overwhelmingly in favor of granting the verdict that reasonable jurors could not arrive at a contrary conclusion. Moore v. Aetna Casualty And Surety Company, 454 So.2d 1273 (La.App. 2nd Cir.1984); Roberts v. St. Bernard Parish School Board, 427 So.2d 676 (La.App. 4th Cir. 1983), writ denied 433 So.2d 1053 (La. 1983). Therefore, in view of the previous granting of partial summary judgment, plaintiff must prove:
(1) that unodorized natural gas was a cause in fact of the accident;
(2) that Monterey had a duty to odorize the natural gas it supplied to Union;
(3) that Monterey breached its duties; and,
(4) that plaintiff was harmed by this breach of duty.
It is well settled that natural gas is an inherently dangerous instrumentality because of its highly flammable and explosive character. Those who handle and distribute it are charged with the duty to exercise that degree of care commensurate with its dangerous character and necessary to protect the public from any forseeable injury therefrom. Naquin v. Marquette Casualty Company, 244 La. 569, 153 So.2d 395 (1963); Harris Drilling Co. v. Delafield, 222 La. 416, 62 So.2d 627 (La.1952); Raphael Brothers v. Cerophyl Laboratories, 211 La. 354, 30 So.2d 116 (1947); Wiggins v. Arkansas Louisiana Gas Company, 441 So.2d 803 (La.App. 2nd Cir.1983); Kalmn, Inc. v. Empiregas Corporation, 406 So.2d 276 (La.App. 3rd Cir.1981). Normally a supplier of natural gas has a duty to safely furnish natural gas to its meter and to maintain the meter in good working order. Wiggins v. Arkansas Louisiana Gas Company, supra. See also Reggio v. Louisiana Gas Service Company, 333 So. 2d 395 (La.App. 4th Cir.1976), writs denied 337 So.2d 187, 526 (La.1976); Pagitt Well Service, Inc. v. Sam Broussard, Inc., 293 So.2d 631 (La.App. 3rd Cir.1974), writs refused 295 So.2d 817 (La.1974). However, if a gas supplier knew or should have known that gas pipes or appliances on the other side of the meter are defective so as to present a risk of injury, the supplier's responsibility can extend beyond the meter. Mitchell v. Cohen, 432 So.2d 922 (La.App. 4th Cir.1983).
The trial court correctly concluded that Monterey did not owe a duty to odorize the natural gas it supplied to Union. Further at trial, appellants presented no evidence that there was unodorized natural gas in the tank car at the time of the accident. Appellants did not produce any evidence to establish that natural gas was unodorized in the Union facility at the time of the accident. Additionally, there is no evidence in the record which shows that the fire in question resulted from a natural gas explosion. Thus appellants failed to prove the unodorized gas was a cause in fact of the accident. To the contrary, the evidence presented at trial clearly indicates that the fire in question was an oxygen enriched fire, not a natural gas explosion. This is amply borne out by the fact that the flame had been introduced into the tank car for some period of time prior to the explosion by use of the heating torch, and it was only after the cutting torch had been lighted and operational for some fifteen seconds that the oxygen enriched fire took place.
The natural gas was not owned and/or in the custody or control of Monterey from the time that it entered Union's property and Union's pipeline. The contract between Monterey and Union clearly provided that the natural gas was to be delivered in *598 its natural state free from any objectionable liquids and solids, and that once it entered the premises of Union, Union was in control and possession of the natural gas. Union was solely responsible for any and all injury including death or damage to its employees, with Union being in exclusive control and possession of said gas and responsible for the odorization of the gas. Monterey maintained the pipeline up to the property line and Union's meter, and Union maintained the pipeline from its meter to the plant. Union was required to introduce the malodorant and maintain the device, and Union was solely responsible for stenching or odorizing the natural gas supplied to it by Monterey. There was no evidence presented that the malodorant was not being properly injected into the natural gas by Union. Further, there was no evidence that Monterey knew or should have known of any unsafe practice pertaining to its natural gas being carried out by Union.
Therefore, viewing all evidence in a light most favorable to the appellants, reasonable jurors could not conclude that Monterey was negligent in failing to odorize the gas it supplied to Union, and the trial judge correctly directed a verdict in favor of Monterey.[3]
Therefore, for the above reasons, the trial court was correct in granting Monterey's motion for directed verdict, in that under the facts presented there was an absence of duty on the part of Monterey to odorize the natural gas it supplied to Union.

CONCLUSION
For the above reasons, the judgment of the trial court is affirmed at appellants' costs.
AFFIRMED.
NOTES
[*] Judge Remy Chiasson, retired, has been assigned temporarily to this court by the Supreme Court of Louisiana to fill the vacancy created by the death of Judge John S. Covington.
[1] However, none of these matters are pertinent to the issues before us on this appeal.
[2] No appeal was taken from this judgment, which is now final.
[3] See, however, cases pertaining to liquidified petroleum gas (LPG) where there is a statutory duty on the part of manufacturers and distributors of LPG to properly odorize the gas sufficient to act as a warning agent. Wallace v. Pan American Fire & Casualty, 426 So.2d 224 (La. App. 3rd Cir.1982), writ denied 430 So.2d 97 (La.1983), and cases cited therein.